Commonwealth ex rel., Attorney General, Appellant, v. Beaver Borough, Stephen Minor, Burgess, and Henry Hice, Richard S. Holt, Joseph L. Holmes, John R. Eakin, James J. Davidson and James H. Cunningham, Members of Council.

*Public lands—Reservation of squares in boroughs—Municipalities—Dedication.*

Where the commonwealth reserves for " public uses " certain squares in a town, which the officers of the commonwealth mark " public squares " on the plan of the town, by which lots are sold, the commonwealth will be presumed to have dedicated the squares for such appropriate uses as would, under usage and custom be deemed to have been fairly in contemplation at the time of so laying out and selling lots on the plan, as courthouses, markets, churches and pleasure grounds, etc.

Where a borough having such public squares within its limits is brought under the general borough law of April 3, 1851, P. L. 321, the borough authorities have full power to regulate and care for the public squares, in so far as their action does not affect the designation of public uses previously made by acts of assembly; and in the exercise of such power they may lay out a pleasure drive around the borders of the square.

*Road law—Streets—Shade trees in streets—Nuisance.*

The mere partial obstruction of a part of a street by shade trees, when

such obstruction does not interfere with the public use, is not a nuisance per se.

In the absence of municipal regulation, lot owners may for purposes of necessity, ornament or convenience, partially obstruct a highway in a reasonable manner, so as not to prevent the use of the highway by the public; and the municipal authorities may, by ordinance or otherwise, regulate the manner of this public use and ornamentation, with a reasonable discretion, which will depend on circumstances.

*Road law—Regulation of streets—Act of April 3, 1851—Boroughs.*

Section 3, par. 8, of the act of April 3, 1851, P. L. 323, making it the duty of borough officers " to give due and personal notice to all persons resident in the borough directly interested therein of any proposition to fix or change the roads, streets, lanes, etc., or in the grading or regulation thereof, and to designate a time and place when they shall be heard in relation thereto," is merely directory and the omission of such notice does not invalidate the proceeding. White v. McKeesport, 101 Pa. 400, followed.

A resolution of a borough council in the nature of an ordinance changing alleys, not transcribed in the ordinance book, and not presented to nor signed by the burgess, and not advertised or published as required by law, is invalid.

Argued Oct. 16, 1895. Appeal, No. 189, Oct. T., 1895, by plaintiff, from decree of C. P. Beaver Co., June T., 1894, No. 6, on bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL and FELL, JJ. Affirmed.

Bill in equity to enjoin the borough authorities of Beaver from using certain portions of the public square as a highway, and to prevent them from closing certain alleys.

The bill averred (1) that defendants are a municipal corporation in the county of Beaver and the regular constituted officers thereof; (2) that the town of Beaver was laid out by the commonwealth of Pennsylvania upon a tract of land reserved by the commonwealth, and that the said commonwealth reserved for public uses certain lands within the town plot, part of which is the northwest central square, on which the courthouse now stands; (3) that the streets of said town were laid out of the width of one hundred feet, and the alleys of the width of twenty-five feet, and were dedicated to public use ; but the said square, inter alia, never was so dedicated, but was reserved by the state, which alone has the power to declare to what public use the same may be applied ; (4) that the defendants have unlawfully

entered upon said square, have dug up and removed the soil and earth from a portion thereof, dug up and removed ornamental and shade trees, and have constructed in part, and threaten to construct, an alley or highway, and laid a pavement upon the north side of said square and within the limits thereof, and have closed Turnpike alley, the northern boundary of said square, without notice to the plaintiff and without any ordinance therefor, and that they are about to enter upon said square for the purpose of removing the fence therefrom and exercising ownership and control; (5) that plaintiff has suffered and will suffer irreparable injury and has no adequate remedy at law.

The bill prayed for an injunction to perpetually enjoin defendants from entering upon said square and appropriating any part as a public highway, and for a decree requiring defendants to open and keep open Turnpike alley, and for other and further relief. The answer admitted paragraph one and the first part of paragraph two, but averred that said square, with others, was dedicated by the commonwealth to public uses. The first clause of paragraph three was admitted, but it was denied that said square had been reserved and averred that said square had been dedicated to public uses, and that the borough of Beaver had dominion over, care and control thereof; and that the occupation thereof, except to such an extent as was reasonably sufficient for the courthouse, by the county of Beaver, was unlawful and in violation of public right. Paragraph four was admitted to this extent, that they had entered upon said square, had constructed in part and intended to complete the construction of a driveway along the western side and partly within the limits thereof; had dug up and removed two or three shade trees; that they had constructed a driveway about twenty-five feet in width along the northern side of said square and within the limits thereof, and had permitted a curb and sidewalk to be placed thereon; but it was denied that they had closed, or permitted to be closed, Turnpike alley, and averred that said alley had been practically closed for fifty years and that no notice to plaintiff of said acts had been required by law. It was also denied that they were about to remove the fence from said square, but averred that said fence was maintained by the commissioners of the county of Beaver without any lawful authority. Paragraph five was denied. And it was averred that all acts by

them done were in pursuance of a general plan for the improvement of the streets, alleys and public squares of said borough.

The case was heard on bill, answer and proofs.

The case of Buchanan v. Beaver Borough, *post*, 567, is the other case referred to as having been argued at the same time. Ewing, P. J., of the 5th judicial district, specially presiding, filed the following opinion :

These two cases, to a great extent, involve the same questions of fact and the same questions of law. They were tried for the most part together, and were together argued by the same counsel at the same time. They involve questions as to the streets and public squares of the borough of Beaver, the power of the borough councils in relation thereto, and the action of the borough authorities in relation to certain streets, alleys and public squares.

The town of Beaver was laid out by the state of Pennsylvania from lands reserved out of the depreciation tract north of the Ohio river. The act of September 28, 1791, authorized the governor to direct the surveyor general to lay out a town and outlets ; and the act of 1793 empowered the governor " to direct the surveyor-general to survey 200 acres of land in town lots, on or near the ground where the old French town stood, in such manner as the commissioners appointed by the governor should direct," and provided that the governor should reserve out of the lots of said town so much land as " he shall deem necessary for public uses." Under this act of 1791, though not in strict conformity therewith, Daniel Leet, deputy surveyor general, in the absence of commissioners, laid out the town of Beaver, and an act of assembly of March 6, 1793 (3 Smith Laws, 90), was passed confirming the survey and authorizing the governor to sell and convey the lots contained in the survey subject to the provision, " in the manner and under the regulations, exceptions and reservations prescribed in the act of assembly 28 September, 1791." And the governor, acting under this provision, directed the surveyor general to mark the reservations required by the act of 1791 on the town plot. Daniel Leet had only marked the four central squares as public squares. On the 11th of March, 1793, the governor, through his secretary, directed the surveyor general as follows : " The governor directs me to inform you, that besides the lots marked

public square, he deems it expedient to reserve for public uses lots Nos. 1, 20, 21, 22, 155, 156 and 153, and you will be pleased accordingly to mark official entry thereon on the original survey in your office." This was accordingly done, and on the 12th of March, 1793, the governor issued his commission to sell, so that the four lots in the center and the corner lots of the town plot marked "public squares" shall be reserved as lands deemed necessary for public uses and reserved by the governor accordingly. And under these acts and the action of the governor, and in accordance with this town plot made by Daniel Leet, approved by the general assembly and by the governor, the lots so laid out in the town of Beaver were sold. The streets were laid out on a plan parallel with the Ohio river, to wit: Front, Second, Third, Fourth and Fifth; and Beaver, Elk, Market, Raccoon and Buffalo at right angles thereto. Each of said streets was laid out and marked on said plan as being one hundred feet in width, except that Fifth street, the northern boundary, and Buffalo street, the western boundary, are marked on the plot as being two hundred feet in width. Between each of these streets equi-distant were laid out and marked alleys of twenty-five feet in width. The northeast block of lots and the northwest block are marked in plan "public square," and were not sold. The portion lying bounded on the north by Turnpike alley, on the east by Insurance alley, on the south by Corporation alley, and on the west by Commerce alley, divided into four squares by Third street running east and west, and Market street running north and south, each of which on the plan is marked "public square," were reserved for public use and not sold. Each of these public squares is three hundred feet, running north and south, and three hundred and sixty feet east and west, exclusive of streets and alleys.

The borough of Beaver was incorporated by act of March 29, 1802, P. L. 116. By proceedings in the court of quarter sessions of Beaver county, at No. 2, September Term, 1866, the borough was brought under the general act of 1851, and is subject to the general laws and has the same powers, privileges and duties as conferred by the general borough laws of this commonwealth. The original act of incorporation appears to have given but limited powers to the borough authorities. .

By act of April 2, 1803 (4 Smith Laws, 89), the legislature

designated the southwest square as a place for the erection of a courthouse and public building " on such part of the public square as the commissioners of the county might think proper," and on that square a courthouse was built, occupying, with the ground inclosed, about one fourth the square.    In 1876 a new courthouse was built on a different part of the same square. The jail, however, in 1856, was removed to other property. By act of March 29, 1824, the trustees of the Presbyterian church were authorized to occupy a portion of the southwest square, not exceeding one quarter of an acre, for a church, and a building was erected and used in accordance with this grant, but which has recently been abandoned and a new church built on property outside of the public square.    By act of April 10, 1826, the Methodist Episcopal Church trustees were granted leave to occupy a quarter of an acre of the southeast square for a church, and it is so occupied.    By act of February 25, 1815, the Beaver Academy was allowed to erect a building on the southeast square, and a portion of that square was so occupied for many years.    The academy has since been removed from that square.

The contention in these two cases relates to the action of the borough councils and the borough authorities in relation to these four central squares and the streets or alleys bounding the same.    The town of Beaver seems to have had a very gradual growth.    As originally marked out on paper it was a magnificent plan, having very fine, wide streets and large, deep lots.    Nevertheless, as in so many towns in western Pennsylvania, the fashion was to build houses out to the line of the street, and rather than lose land in front, the owner preferred running the risk of building a little over on the street, so that the front of the houses were built, as a rule, on or near the street line.    When there were porches erected they were frequently built out on the street.

There appears to have been for a long time but little attention paid by the municipal authorities to the streets, and even as far back as thirty years ago, according to my recollection—and the evidence shows the fact—the streets of Beaver were mere country roads.    An occasional proprietor, in the business part of town—if it may be said to have had such a portion—might have had a small pavement of brick in front for his own

accommodation; but the man who had a cinder walk in front of his residence on the street was entitled to be considered a citizen of unusual public spirit and enterprise. The public squares were unsightly places, in fact, nuisances. And up until 1883 the lot owners, so far as the occupying and using these alleys or making any pavements or improvements was concerned, were very much like Israel of old, "without a king, and every man did that which was right in his own eyes."

A municipal revolution occurred in the election of 1882, and a borough council was elected on the question of municipal improvements, and those in favor thereof were in the majority. The council so elected passed ordinances enacting that sidewalks be laid on Third street from the eastern to the western boundary and paid for by the property owners. And they, also, it would appear from the testimony — although the ordinances were not produced, the testimony shows they were passed— enacted that sidewalks of brick or stone should be laid on the four alleys bounding the central public squares, at a like expense. It seems that this gave rise to very serious opposition, and a distinguished lawyer (now deceased) and a property holder, opposite one of these public squares, resisted the matter in court, and personally declared he would not submit to have brick sidewalks placed in front of his residence. In time, however, he became reconciled and of his own accord put down a sidewalk. The resistance to these enactments of council was so great that the sidewalks on these alleys were not laid of either a uniform grade or a uniform width, or to uniform places on the alley.

On the 9th of August, 1892, councils passed an ordinance providing for the improvement, grading and paving of Third street from boundary to boundary. In pursuance of which, in 1893, the street was improved to a width of about sixty feet, paved with brick from the western boundary to the eastern boundary of the public square, leaving a space of twenty feet between the sidewalk and the property line and the line of the public square unpaved; and from the east side of the public square eastwardly for some distance the whole width was improved, and then beyond towards the eastern boundary the improvement is sixty feet in width. A grade was fixed and the street was graded in accordance with this ordinance.

And a matter of importance in relation to one of the complaints in this case is this : At the crossing of Commerce alley, Third street in this improvement was graded down to a depth, the borough engineer says, of two and one half feet, presumably at the crown of the pavement, as at the side it is evidently three feet or more, thus cutting off Commerce alley from Third street on either side, without the necessary grading of Commerce alley to accommodate itself to the new grade of Third street as improved, graded and paved. The borough authorities, apparently by general consent, having undertaken to improve the streets, began to grade and work on these wide streets, and the traveled portion—sidewalks included—through the town is from forty to fifty feet, except as before stated as to Third street. The portions lying between the sidewalks and the property line is left in grass, and has upon it fine shade trees varying in age. But this unpaved portion lying between the improved portion of the street and the property line, with its grassy plots and shade trees, has become a prominent feature of the town ; and this class of improvement has changed it from an unsightly, slovenly kept, place, as it was thirty years ago, until it is really a very beautiful town.

Except as to the designation of portions that may be occupied for these various public buildings the state of Pennsylvania has paid no attention whatever to these central public squares ; they have been left entirely neglected or to the care of the borough authorities or to such public spirited citizens as may have seen fit to contribute to their improvement, and up to within a few years were places for nuisances. The borough authorities have within a few years taken charge of these public squares, made paths through them, have planted trees and cared for them, and they are now in fairly good order and are an attractive feature of the town.

On the 24th of May, 1893, the borough councils passed a resolution for improvement as follows : " On motion of Davidson seconded by Holt, the plan submitted to council by H. T. Barker for the improvement of streets and pavements around central public square is adopted, Hice, Cunningham, Davidson and Holt voting therefor unconditionally ; Eakin and Moore voting for its adoption on condition the property holders should move their pavement out to conform to the new plan at their

own expense," and the plan produced shows what was intended clearly as to the squares was indefinite as to the alleys. It is of the action under this resolution and plan that the bills complain. A large amount of testimony was offered on each side and admitted that the court was unable to say at the time whether or not it was relevant, but which we have not considered relevant and have entirely disregarded. As before stated, the alleys on each side of these public squares were laid out of the width of twenty-five feet for highways. On one side of that twenty-five feet were the private lots sold to different parties, and on the other side the public square.

As to the bill of John M. Buchanan, Esq., the first and second paragraphs are true. The third paragraph is true thus far: " That your orator, and those under whom he holds, under the direction of the town council and its engineer, and under an ordinance of said borough, paved the sidewalks in front of their said properties, the premises aforesaid, on the west side of Commerce alley and the south side of Corporation alley, entirely at their own cost and expense, about the year 1883, and according to the grade then and there established ; " but as to that part which says, " said sidewalks being of a width of nine feet, leaving a roadway of sixteen feet," the evidence does not bear that out. While the sidewalk laid may have been less than nine feet in width, nevertheless the owners of the property there had planted a line of shade trees on Commerce alley outside of the center from their property line ; and the curb as set in 1883, by the plaintiff or those under whom he claims, is thirteen and one half feet from the property line, leaving only eleven and one half feet from the curb to the outside of the street. As to the other portion of this paragraph, " that the land immediately opposite your orator's property on said alleys is not the property of the defendants," is a question largely of law to be hereafter discussed—it is the public square.

The fourth paragraph, " That the said council has commenced to remove the curb, tear up the sidewalk, laid as aforesaid on the west side of Commerce alley ; disturb the trees, dig up and carry away the earth from said alley immediately adjacent to, and in front of your orator's property, and to place the curb, laid as aforesaid, in a ditch already dug at a distance from your orator's property of eighteen and one half feet." That is cor-

rect, except that the plan shows that it is eighteen feet, not eighteen and one half, "leaving a roadway six and one half feet ; " it should be seven; "and at a depth of three feet or thereabout below the grade established as aforesaid.    That said excavation and change of sidewalk extend a distance of seven hundred feet and close to public travel."    That is true.    Nevertheless the fact is that the grading of Commerce alley on each side of Third street was made necessary, in fact essential, by the previous grading and improving of Third street, the leading street in the town.    The grading of Third street at this point to the depth before stated necessarily carries with it the grading of Commerce alley to accommodate it to that grade, and if damage is done to the plaintiff by that grade, it is a part of the necessary damage resulting from the change of grade at his property on Third street, on which his property fronts.

As to the fifth paragraph, " That the defendants are about to remove the curb and sidewalk upon the south side of Corporation alley," is true; " which changes so made and about to be made, change the original plan of the streets and alleys of said boroughs and destroy the symmetry, harmony and uniformity thereof," we are not prepared to find from the testimony.

The sixth paragraph raises a question of law on the facts.

The seventh paragraph raises a question of law.

The eighth paragraph appears to be true as a matter of fact.

The ninth paragraph, " That the injury done your petitioner would be irreparable, and he is without adequate remedy at law," in our judgment is not founded in fact; the injury, if any, clearly is not an irreparable injury, nor is it such as cannot be compensated in damages, for which the plaintiff not only has a right of action but has instituted an action in the common pleas court of Beaver county, as to property at Third street and Commerce alley, viewers were appointed and said viewers have reported him damages for the grading of Third street and Commerce alley in connection therewith.

In the bill of the commonwealth against the same parties, the first, second and third paragraphs of the bill are true, as already found.    The fourth paragraph, " That the defendants have unlawfully entered upon said square, have dug up and removed the soil and earth from a portion thereof, dug up and removed ornamental and shade trees, and have constructed in

part and threaten to construct an alley, street or public high-
way along or upon the west side of said square, and partly
within the limits thereof, and have unlawfully entered upon
and constructed an alley, street or highway, set a curb and laid
a pavement or sidewalk upon the north side of said square, and
within the limits thereof, and have closed or permitted to be
closed and remain closed Turnpike alley, the northern bound-
ary of said square, which was and is a public highway; all of
which acts and things have been done without legal notice to
your orator as required by law, and without the passing of an
ordinance authorizing the same, and they are about to enter
upon said square for the further purpose of removing the fence
therefrom and exercising ownership and control," is a mixed
question of law and fact.    The facts alleged are in part true
and in part are not sustained by the testimony.    The facts
found by the court upon the testimony will be stated hereafter.

Fifth: " That by reason of the unlawful acts of the defend-
ants as aforesaid done and about to be done, your orator has
suffered and will suffer irreparable injury and has no adequate
remedy at law, and therefore prays," etc., is largely a question
of law, although the evidence does not indicate that the actual
damage to the commonwealth is appreciable.

The counsel and parties requested the judge trying the case
to accompany them on a trip around these squares and exam-
ine the same.    He did accompany them, and in such a tour of
investigation, at their request, has endeavored to make himself
familiar, by sight, with the surroundings.    First, as to Turn-
pike alley: Private property or lot owners on the opposite
northwest square, namely, " the courthouse square," are, on
the west Mr. Laird; next comes Judge Agnew, and next on
market street Judge Hice, each having lots one hundred and
twenty feet in width and running back three hundred feet or
more.    Opposite the northeast square the property is occupied
very much in the same way.    The houses were originally set
out, either the house line or with the porch to the extreme of
the lot limit, unless it be the house occupied by Judge Agnew,
which is now a short distance back from the street.    Mr. Laird's
house was built probably fifty years ago or more out to the
street line, and the porch over the street or alley line, and has
so continued.    At the other corner, occupied by Judge Hice,

the house was so originally built; now a new house stands back from the street.   Also, at the northeast square some of the houses have their porches built over on the street, and have long been so occupied.   Opposite the courthouse square a row of trees—maple, catalpa and horse-chestnut—were planted at least forty years ago, at a distance of fifteen feet from the property line.   They have grown to be very considerable trees. Since those trees were planted the driveway has been outside of those trees, leaving fifteen feet between the property line and the line of trees for foot travel and for ornament.   Along this line were some of the earliest improvements of the borough, in the way of a cinder walk; but some twelve or fifteen years ago the three owners joined together of their own accord and put down a neat brick pavement at their own expense between the property line and this first row of trees, leaving about six feet between the sidewalk and the row of trees.   The travel by vehicle was then outside of this fifteen feet—or with the growth of the trees almost sixteen feet—leaving only nine or ten feet for a roadway.   At an average of about twenty-two feet from the first line there was a second row of trees on the public square.   The line of travel by vehicles then lay in part between this row of trees, sixteen feet from the property line, and the row on the public square, being of the average width of about twenty-two feet, and almost necessarily has been in part on the public square; and until recently there was nothing to prevent horses and vehicles from going any place on the public square. And the weight of the testimony is that for a considerable length of time the larger portion of the travel was wholly on the public square.   Opposite the northeast square, on Turnpike alley, at least two porches were out on the alley, and in addition a row of trees run along the entire front, out so far as to drive vehicle travel almost entirely on the square.   These trees were planted by private owners, and nobody seems to have objected. Shade trees on the streets and in front of properties seem to be a feature of Beaver town, which the people are generally satisfied with and of which they are justly proud.   In fact, the warmest opponents of the action of council would be unwilling to have these trees removed, and claim that they are not a nuisance and should not be removed.

The borough council in making improvements assumed that

they were the custodians of these public squares held for public use, and that they had a right to improve them as in their judgment comported with the public benefit, and they were confronted with this problem of the shade trees, many houses standing out to the street lines and shade trees standing out on the alley in front, many of them grown to be of good size and useful, which it would take many years to reproduce. And, being anxious to improve and beautify the town, and especially these public squares and their surroundings, they undertook in their discretion to leave these trees and to construct a driveway on the public square in front of Turnpike alley of about eighteen feet in width and a paved sidewalk of about six feet; thus constructing driveways so as to avoid the necessity of taking out these trees and so as to make a reasonable and commodious driveway around the entire central public squares, a distance of over half a mile. On Commerce alley the old curb line was thirteen feet from the property line, and of that thirteen feet a portion was occupied by a brick pavement and a portion a grassy plot, with trees close to the curb line, leaving twelve feet for a driveway. The plan on which the borough council have acted is to make the curb line eighteen feet from the property line, and a driveway on the balance of the twenty-five feet of Commerce alley, and in part on the public square, the driveway to be twenty feet in width, seven feet on a part of the alley and thirteen feet on the public square. On Corporation alley side a driveway of twenty feet, the larger portion of which would be on the public square; and on Insurance alley a driveway of twenty feet, of which about twelve and one half feet would be within the lines of Insurance alley and seven and one half feet taken from the public square.

In regard to the alleged closing of these alleys as laid out by the commonwealth, the defendants deny that they have closed them to public travel. There has certainly been no legal vacation or closing of any of these alleys. As to the encroachment by private persons upon the alleys, it is sufficient to say in regard to all that testimony, if any claim of right is based on the long, uninterrupted, continuous acts of encroachment by the lot owners and acquiescence by the public, that it is not sufficient to raise any question as to right. The right of the public to the alleys is unimpaired thereby. The defendants.

have not by any act of theirs closed these alleys further than by the curbing and footwalk on Market street at Turnpike alley, and at the junction corners of Commerce and Insurance alleys. On Turnpike alley the curb is so set and the pavement so laid that vehicle travel would be impeded thereby.   The principal obstruction to travel, aside from the trees and the sidewalks, is one erected by Mr. Laird across Turnpike alley at the junction with Commerce, at which place he has an iron railing.   According to the testimony, that is an erection by Mr. Laird, without any authority of councils, without their consent, but of his own private motion, and if a nuisance, as it certainly is, it is removable as any other nuisance erected by a private party.

In regard to the damage claimed by Mr. Buchanan, that he has suffered irreparable damage, by this work done and proposed work on Commerce alley, to his lot, which fronts ninety feet on Third street and runs back along Commerce alley one hundred and fifty feet towards Turnpike alley, we have no doubt he is sincere in his belief that it damages him.   The weight of the testimony is that it does not, but on the contrary will benefit his property.   The damage to his property, as before stated, comes from the grading and improving of Third street, which is already done and for which he has had an award of damages. The grading of Commerce alley, we have already found, is a necessary consequence.   My own judgment, on an inspection of the property in company with the owner and the attorneys would be, that the change of grade on Third street already made and settled, makes necessary the change of grade on Commerce alley ; that the changes the council propose to make is not only a detriment, but it will add very considerably to the market value of the property.   As to his property fronting on Corporation alley, at the corner of Commerce alley, the testimony is in equilibrio.   I would be unable to find, as a matter of fact, that it was damaged.   And the same thing would be true of his other property ; but if damaged he would have legal redress to recover damages.   Further, that while in our opinion the question for the court to decide is one of power in the councils, not one of discretion, yet as a higher court may have a different opinion, we find as a fact that the proposed making of these driveways around and in part on the public square will be an improvement to the public squares and of general public bene-

fit to the town, and we are unable to see that there is, in fact, any private detriment to be suffered by the lot owners, but to a great extent it will not only be beneficial to the public, if carried out, but will add to the value of the properties on the alleys and fronting these squares.

The grading on the public squares is merely the necessary grading for the driveways and proper sloping thereof, the larger portion of it rendered necessary by the grading of Third street, whether the proposed change in the location of driveway on the alleys be made or not. The work on the square in front of Turnpike alley was completed before bill filed, as was also the larger portion of the work on Commerce alley. The work has been done at expense of borough without special expense to the lot holders. The proposed changes or improvements on the public squares in no way interfere with the public uses heretofore designated by the legislature.

On the pleadings and findings of fact there arise two general questions as to the power of the borough authorities and the manner of its exercise :

First, as to the public squares within the borough limits; and, second, as to the public streets therein.

Counsel for the complainant take the broad ground that the state has never dedicated these squares for public use, but simply reserved them, and that the state as owner has the absolute power of disposal, control, and at least has the sole and exclusive right to direct and limit the uses thereof; and that the borough authorities have no power over the squares to regulate and manage, unless perhaps to keep them clean, but not even to cut down a tree, whether of natural growth or planted by the borough or a private person.

The very able and ingenious argument of Hon. DANIEL AGNEW, late chief justice, contained in that valuable publication, "Settlement and Titles in Northwest Pennsylvania," and in other documents, and his argument in this case, presents this view in the strongest possible light. I have so long been accustomed to follow and rely on his judgment in such matters as to doubt my own judgment when not in harmony with his views , but in this case the argument fails to convince me that it is correct.

The state as owner of the land laid out a town plot to pro-

cure money by the sale of lots therein. Following the custom of private owners, and especially that of William Penn and his descendants, it provided for reserving for "public uses" certain squares in the town. Its proper officers had these squares marked on the plan "public square," and by this plan the lots were sold.

If a private owner of land had so laid out a plan of lots, and so marked and reserved public squares, declaring that they were not to be sold but reserved for public use, and had so sold the lots, there can be no doubt that under the law as laid down in the courts of this and other states, and of the United States, it would be held to be a dedication for such appropriate public uses as would, under usage and custom, be deemed to have been fairly in contemplation at the time of so laying out and selling lots in the plan, as court houses, markets, churches, and for pleasure grounds, etc.: Barclay v. Howell's Lessee, 6 Peters, 498; Cincinnati v. White's Lessee, 6 Peters, 431; New Orleans v. U. S., 10 Peters, 721; Commonwealth v. Rush, 14 Pa. 188; Commonwealth v. Bowman, 3 Pa. 202.

The various cases in relation to the public squares and commons in Allegheny City, in my judgment, sustain this view. The act of assembly in that matter reserved the squares "for use of the state," and designated the use in the central squares.

In Birmingham v. Anderson, 48 Pa. 258, the rule is stated thus: "It has been the practice in this country in laying out towns to have the plat surveyed and a plan made in accordance with the survey designating the streets, public squares and open spaces left for commons; wharves or any other public purpose. Those streets, squares and open spaces are thus dedicated to the public by the proprietors of the soil, whether they be the state or private individuals."

In Cook v. the City of Burlington, 30 Ia. 95, the act of congress of July 2, 1836, directing the laying off of the town of Burlington, provided that the quantity of land on the river bank at the town of B, and running with said river the whole length of said town "shall be reserved from sale for public use and remain for use as a public highway and for other public uses." Held, that the strip so reserved was dedicated to public use, and that after the sale of lots the act of making this dedication assumed the character of a contract and could not be abrogated by congress or its grantee.

It is difficult to see any equitable reason why there should be one rule as to the private owner and another when the state, as an owner, does the same thing.

It seems to us that the state by its action not only reserved from sale, but also dedicated to public use, the squares in question.

The argument drawn from the fact that the state undertook to designate thereafter some of the public uses to which these squares might be put is at most but persuasive authority.

If it was in derogation of the right it would not affect the question: New Orleans v. U. S., 10 Peters, 716.

The state, after the sale of lots, held the legal title thereto, but in trust for the proper public uses.

The original borough charter gave but meager powers to the borough authorities. The legislature had power to provide by special or general enactment how all such public squares or streets should be used; and this whether the legal title to the land was in the state or in a private person, provided it did not violate the terms of the original dedication.

To this inherent power of the legislature to exercise municipal authority may be attributed the acts of assembly designating the portions of these public squares to be used for a court-house and for churches, rather than to any right or even claim to exercise such power as owner of the land.

This power of regulation had not then been delegated to borough councils.

By the act of April 3, 1851, P. L. 321, sec. 2, the corporate officers of boroughs were given power, inter alia, " to regulate the roads, streets, lanes, alleys, courts, common sewers, public squares, common grounds, footwalks, pavements, culverts, gutters and drains, and the heights, grades, widths, slopes and forms thereof and they shall have all other needful jurisdiction over the same."

By the act of assembly of 8th of May, 1855, the trustees of the Beaver Academy were authorized to occupy the public square in the southeast corner of the borough of Beaver for new academy buildings, " provided that the same be done with the consent of the burgess and councilmen of said borough."

This is persuasive authority in favor of power in the borough, although the borough of Beaver did not come under the gen-

eral borough law until proceedings had at No. 2, September session, 1866, of the court of quarter sessions of Beaver county.

This legislation and the proceedings in court bringing the borough under the general borough law, vested in the corporate authorities full power to regulate and care for these public squares, not, however, to affect the designation of public uses heretofore made by the acts of assembly, but to improve, beautify and regulate for public benefit specially for the inhabitants of the town, and incidentally for the public generally.

The legislature may by general act resume its power of regulation and control, but it is very doubtful if any special act relating to the public squares of Beaver would now be constitutional.

The present constitution prohibits special or local legislation regulating the affairs of boroughs or relating to "public grounds" not of the state.

But even if the state has the power claimed by plaintiff, it has failed to exercise it for many years,—it has failed to care for the public squares. The borough authorities must care for them to prevent them from remaining or becoming a public nuisance.

And it will be time enough for the attorney general to intervene when the legislature directs some one to take charge or designates some other public use with which the regulations complained of are inconsistent.

The council can regulate, care for and improve the public squares by ordinance or resolution, or otherwise by its officers in any way not inconsistent with the proper public use. We are unable to see that making the driveways complained of is an unreasonable or unlawful exercise of the power to regulate.

Unless the shade trees are to be removed from the alleys of twenty-five feet in width there is not sufficient room to make a convenient or safe pleasure drive around the squares without occupying a part thereof with such driveway.

The council, in its discretion, has seen fit to make the sufficient way by taking a part of the alley ways and a part of the square. We would, if fixing the plan, have paid less attention to existing rows of trees, looking to the future to supply the place by others; but we are unable to say that the plan of councils is either unreasonable or that it is not the best that could have been adopted at this time.

The commonwealth has no ground for complaint of invasion of its rights in these public squares. As to the streets or alleys complained of, a different question arises.

No action has been taken to vacate these alleys laid out by the commonwealth in its plan of the town of Beaver and vacation thereof is denied.

Numerous encroachments have been made thereon by buildings and otherwise. Borough authorities, the public and other owners of property have submitted to these encroachments for thirty, forty or fifty years.

All this, however, does not legalize the obstructions, nor bar the right of the public to have the street kept open.

This bill is filed to prevent the borough authorities from closing the alleys.

We are asked by counsel to take the broad ground, that " the public is entitled not only to a free passage along the highway, but to a free passage along any and every portion of it not in the actual use of some other traveler."

Commonwealth v. Joseph McNaugher et al., 131 Pa. 55, and other authorities are cited in support thereof.

This doctrine would not only require the removal of the porches and steps encroaching on these alleys, but would exclude shade trees or any other ornamentation on the streets. The case of Commonwealth v. McNaugher, supra, was that of a permanent building and fences erected unlawfully to exclude the public from use of the street.

The general proposition that the public have a right to travel on foot or in vehicles over every portion of the highway is modified largely by exceptions.

In Commonwealth v. Zimmerman, 95 Pa. 292 (Mercur, J.), in delivering the opinion of the court, says : " So shade trees may stand between the sidewalk and the central part of the street without constituting a nuisance per se. The mere partial obstruction of a part of the street, when in fact such obstruction does not interfere with the public use, does not create a nuisance. . . . . The right to partially obstruct a street does not appear to be limited to a case of strict necessity. It may extend to cases of convenience or ornament, provided it does not unnecessarily interfere with public travel."

In Commonwealth v. Hauck, 103 Pa. 536, defendant had

built his house within a foot of street line and had laid a sidewalk seven and a half feet on the street, and outside the sidewalk had planted six trees and placed two hitching posts, and this on a street thirty-six feet in width. Held not to be a nuisance nor an unlawful obstruction of the highway.

In Livingston v. Wolf, 136 Pa. 519, a borough ordinance authorizing the use of three feet six inches of the footway for steps, bay windows, etc., was held to be a reasonable regulation.

In Huling v. Henderson, 161 Pa. 553, plaintiff, a lot owner, having planted shade trees on the street in front of his lot out on the public street, recovered damages against defendant for trimming the trees so as to kill them.

These, and numerous other cases in this state and elsewhere, show that in the absence of municipal regulation lot owners may, for purposes of necessity, ornament or convenience, partially obstruct a highway in a reasonable manner, so as not to prevent the use of the highway by the public. And that the municipal authorities may, by ordinance or otherwise, regulate the manner of this public use and the ornamentation. What is a reasonable exercise of this discretion depends on the circumstances.

In this case, except as a pleasure drive, there is but little vehicle travel on these highways around the public squares, the lots being occupied, for the most part, as private residences. Adopting the views of Judge AGNEW, ten feet would be sufficient width for the roadway for all this travel. The public squares, now well cared for, are enhanced in attraction by having a portion of these twenty-five foot streets occupied for ornamentation; lot owners have so used it for many years without objection.

We are of the opinion that the corporate authorities have power by ordinance, or its equivalent, to define the limits of sidewalks and curbs thereon, to the extent that is proposed as to Commerce, Insurance and Corporation alleys, and except as hereinafter stated as to Turnpike alley. If any party is aggrieved by the lawful exercise of authority an appeal lies to the court of quarter sessions : Borough of Chartiers' App., 19 W. N. C. 46; act of 1851, sec. 27, P. L. 326.

The next question is, have the corporate officers proceeded in proper form to exercise this authority?

562    COM., Appellant, *v.* BEAVER BOROUGH et al.

The manner in which the borough councils proceeded to change these streets, i. e., to fix the place for curb, sidewalk and driveway was faulty in many particulars.

1. Such a change would best be made by a formal ordinance, setting forth specially the location of each and specifying the portions to be used as ornamental either by lot owners or the borough authorities, with a plan easily understood, and if changes of grade were to be made they should be specified.

They acted by an informal resolution, adopting the plan or plot of the borough engineer, and while on examination this fixes the locations, yet it is not clear and definite as to alleys; apparently it does not affect Turnpike alley. But the resolution in place of an ordinance would be sufficient if other defects are not fatal: Sower v. Philadelphia, 11 Casey, 231.

2. The act of 1851, sec. 3, par. 8, P. L. 323, makes it the duty of the corporate officers " To give due and personal notice to all persons resident in the borough directly interested therein of any proposition to fix or change the roads, streets, lanes, etc., or in the grading or regulation thereof and to designate a time and place when they shall be heard in relation thereto."

The lot owners abutting on these alleys were directly interested in the changes of sidewalk and driveway, and yet no notice of the proposition to change was given them. Such notice and a hearing might have resulted in a plan satisfactory to all.

Were it an open question we would hold the giving of this notice to be a prerequisite to the jurisdiction to pass such ordinance. There are authorities in the lower courts on both sides of the question, the weight of them being in the affirmative. But in White v. The Borough of McKeesport, 101 Pa. 400, in an action of trespass by a lot owner against the borough, it is expressly held that this provision is but directory, and its omission does not invalidate the proceeding.

The case of Coursin v. The City of Pittsburg, therein cited in support, is easily distinguishable from this question.

In Beaumont v. Wilkes-Barre, 142 Pa. 199, the court below followed, with hesitation, the ruling in White v. McKeesport, and held the provision to be merely directory.

The Supreme Court affirmed the judgment " on the opinion of the court below." The judgment, however, might have been affirmed on one of the other grounds.

In opening of Taylor avenue, 146 Pa. 638, the court below holds, inter alia, as follows: "I am of the opinion that personal notice of the ordinance at least must be given, and also of any proposition to fix, regulate, etc., the roads and streets of the borough to all persons directly interested therein," apparently not having noticed the case of White v. McKeesport. There were other irregularities in the proceedings. The proceedings were set aside, and on appeal to the Supreme Court the judgment was affirmed without any opinion filed or reference to the opinion of the court below, although White v. McKeesport, was cited by appellant's counsel. The judgment might have been affirmed on other grounds. I feel bound to follow the express ruling of the Supreme Court until the same court has expressly overruled its own decision.

3. The same section, paragraph 4, makes it the duty of the corporate officers "to publish it in at least one newspaper, . . . . and by not less than twelve advertisements, to be put in the most public places in the borough, every enactment, regulation, ordinance or other general law, at least ten days before the same shall take effect."

No such publication or advertisement was made of this enactment.

4. The third paragraph of the 6th section of the same act makes it the duty of the burgess to sign the several by-laws, rules, regulations, and ordinances adopted after they shall have been duly and correctly transcribed by the secretary.

The third section of the act of May 23, 1893, P. L. 114, provides "that every ordinance and resolution passed by council shall be presented to the chief burgess of such borough; if he approve he shall sign it, but if he shall not approve he shall return it with his objections to said council at its next regular meeting." Then follow directions as to how it may be passed over the objections of the burgess, and the section provides further: "That before any ordinance shall come into force and effect as aforesaid, the same shall be recorded in the borough ordinance book, with the certificate of the secretary and be advertised as heretofore required by law."

While, as we have before seen, the enactment may be a formal ordinance or the less formal resolution, yet when the resolution is in the nature and has the effect of a formal ordinance, it is

necessary that it should be signed by the burgess, transcribed and published, as is required in case of an ordinance. See 1 Del. Rep. 482.

This resolution, changing the alleys, was not transcribed in the ordinance book, was not presented to, nor signed by the burgess, and was not advertised or published as required by law.

If the act of May 23, 1893, approved a day before the passage of the resolution, was the law governing the proceeding, the failure to present the resolution to the burgess for his signature is fatal to its validity so far as changes in the alleys are concerned. We are of the opinion that it applies only to a burgess elected in 1894, and thereafter.

If it was not it should have had the signature of the burgess, —perhaps this alone would not be fatal. It should have been published at least ten days before it could take effect.

It is barely possible to sustain the ordinance or resolution in nature of an ordinance with all these irregularities and hold that on its now being signed by the burgess and duly published for ten days it would be effective to authorize the changes as to the public alleys in question; but the safer procedure is to pass an ordinance in due form, definitely setting forth the new regulation of the sidewalks and roadways.

All these defects and irregularities taken together seem to be fatal to its validity as an ordinance changing the alleys. As to the public squares it is not necessarily in the nature of an ordinance and as a mere resolution it was sufficient.

We will not make any order requiring the borough authorities to take action to remove nuisances on the alleys maintained by private persons, whether it be barricades or shade trees, except the recently erected railing across Turnpike alley at Commerce alley, which they should have removed.

As to Turnpike alley, the authorities should be required to so change the curbing and gutters at Market street and Commerce and Insurance alleys, as to permit the free passage of vehicles over that part of Turnpike alley lying outside the line of shade trees from property line, as described in the findings; and this either by cutting down or removing the curbing or by placing over the gutter metal crossings, or otherwise so as to afford easy passage for vehicles and to take measures to remove the railing recently placed across Turnpike alley at Commerce alley.

We will not require the replacement of any of the work done, as that would be a detriment to the public and be of no private advantage to any one.   And if our views be correct as to the power of the corporate authorities in the premises, when duly exercised, it is probable that in a short time an ordinance or resolution will be passed with due notice to and hearing of property holders and observance of all legal requirements, in consequence of which much of the work already done will be validated.

Further proceedings to change these alleys complained of must be enjoined until a resolution or ordinance therefor has been duly passed and published.

Let a decree be prepared by counsel in accordance with this opinion.

The borough of Beaver should pay the costs.

*Error assigned* was decree of court.

*D. F. Patterson, Ellis N. Bigger, J. R. Harrah* and *Wm. A. McConnel* with him, for appellant, presented no printed argument.

*L. E. Grim* and *J. R. Martin,* for appellee.—There is a vast difference in meaning, in reserving for public uses, and in reserving for use of the state.   The former are the words used in dedication, and the latter those used in a reservation.   So that the portion of argument of appellants, based upon the Allegheny town act of 1787, goes for naught.

We contend that there is a statutory dedication of the squares to the public.   If there is not, then there is a dedication deducible from the acts of the state.

There may be a dedication of government lands, but the evidence from which consent to user will be inferred must be more than usually clear, to be conclusive in such success: 5 Am. & Eng. Ency. of Law, 407.

Public squares were very clearly recognized as a legitimate public use, and the same rules of law are applicable to the dedication of public squares as to the dedication of highways; 5 Am. & Eng. Ency. of Law, 416; Birmingham v. Anderson, 48 Pa. 258.

Dedication is the appropriation of land to some public use

made by the owner of the fee and accepted for such use by, or on behalf of the public : 5 Am. & Eng. Ency. of Law, 395.

In this case we contend that there was a dedication of "Public Squares" to public use, or in other words to the public, and the title of the state was qualified to that extent: Act of April 3, 1851, P. L. 321; Cook v. Burlington, 30 Iowa, 95; Barclay v. Howell's Lessee, 6 Pet. 498; Cincinnati v. White's Lessee, 6 Pet. 430; New Orleans v. U. S. 10 Pet. 711.

On a statutory dedication prior to the creation of a municipal body to receive it, the fee remains in abeyance until such a corporation is formed, when it immediately vests in the corporation: Maywood Co. et al. v. Maywood Village, 6 N. E. 86.

The passage of the following acts of assembly in reference to the "Public Squares" does not negative that position, for the reason that at the time of their passage the state still had a qualified title in the public squares for public uses, and at that time the people of the whole state were the public, and the state would, at that time, be the only party which had power to designate the public uses of the "Public Squares:" Act of April 3, 1803, 4 Sm. L. 91; act of Feb. 25, 1813, 6 Sm. L. 29; act of March 14, 1814, 6 Sm. L. 132; act of March 29, 1824, P. L. 149; act of April 10, 1826, P. L. 352; act of April 15, 1834, P. L. 449; act of May 8, 1855, P. L. 517; act of April 3, 1851, P. L. 321.

In reference to the alleys, the fact is that there are rows of trees in the center of each. The only things that the town council have done in relation to the alleys was to leave them with their rows of beautiful trees and remove the sidewalks out to the edge of the public squares. Nothing has been done which deprives the public of the free use of the alleys. The borough of Beaver has only exercised its right under the act of April 3, 1851, to regulate the streets and alleys, public squares, common grounds, etc. The facts found by the court below show these regulations to have been reasonable, and being so, they have the right to make them by proper ordinances: Dillon's Municipal Corporations, 4th ed. par. 645; Livingston v. Wolf, 136 Pa. 519.

Per Curiam, October 24, 1895 :

All that can be profitably said in relation to the questions

involved in this appeal will be found in the opinion of the learned judge of the fifth judicial district who specially presided at the hearing.    An examination of the record has failed to disclose any substantial error in either of his rulings, and we are all of the opinion that the decree should be affirmed on his opinion.

Decree affirmed and appeal dismissed with costs to be paid by the appellant.