# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

---

## Mahon *v.* Luzerne County.

*Municipalities—Dedication of central squares—Change of use.*

The title to spaces left open by the original plans of towns or by subsequent general dedication for similar purposes is in the commonwealth for the benefit of the whole public, and the uniform course of decision has been that central squares in the laying out of towns were meant as much, perhaps primarily more, for public buildings than to secure space, and, therefore, the commonwealth may authorize their occupation in that manner without altering their original use.

*Municipalities—Erection of courthouse on central square in Wilkes-Barre.*

The county commissioners of Luzerne county, when authorized by the proper proceedings of the grand jury and the court, have the right to erect and maintain on the public square in the city of Wilkes-Barre upon the location of the present courthouse, a new and enlarged courthouse of sufficient size to accommodate the business of the county.

*County buildings—Approval of court—Act of April 19, 1895, P. L. 38.*

Under the act of April 19, 1895, which requires the county commissioners to "submit the plans and specifications" adopted by them for county buildings to the judges of the court of common pleas for their approval, the court of common pleas must pass not only upon the plans, specifications and contracts, but necessarily upon the size, arrangement, cost, location and other details of the buildings. The court must approve of the plan with reference to the location, and if it fails or refuses to do so, the county commissioners have not complete authority to proceed with the building, and they may be enjoined from doing so at the suit of a taxpayer.

Argued April 12, 1900. Appeal, No. 120, Jan. T., 1900, by defendant, from decree of C. P. Luzerne Co., June T., 1899,

**2**     MAHON *v.* LUZERNE COUNTY.

No. 4, on bill in equity in case of J. H. Mahon et al. v. County of Luzerne. Before GREEN, C. J., McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity for an injunction.

From the record it appeared that in 1898 two successive grand juries reported in favor of building a new courthouse on the public square in Wilkes-Barre. Their report was approved by the court. The county commissioners then proceeded to procure plans. These plans were submitted to the judges of the court of common pleas as required by the act of April 18, 1895. Objections were filed to the approval of the plans, whereupon the court appointed three members of the bar as commissioners to hear testimony and report to the court. The commissioners reported that the plans submitted by F. J. Osterling were appropriate for the contemplated building. Subsequently this bill was filed to prevent the commissioners from proceeding with its building.

WOODWARD, P. J., filed the following opinion:

The bill in this case is filed by certain citizens and taxpayers of Luzerne county to restrain the commissioners of the county from proceeding to erect, upon the center or public square, in the city of Wilkes-Barre, a new courthouse, in accordance with a plan submitted by Architect Osterling and approved by the commissioners. The bill, answer and proofs present for our consideration three principal questions which may be concisely stated thus:

1. Has the county of Luzerne such a title to the square, or such a privilege of occupancy as vests in her the legal right to erect a courthouse, such as the one proposed, which will occupy the whole square?

2. Have the county commissioners the legal right to take down the present courthouse, in which the records of the county are kept, and remove the records to other buildings not fireproof or secure, for such a purpose, pending the erection of the proposed new courthouse; and if they have the legal right so to do, would the exercise of such right, under the circumstances, be within the limits of a sound discretion?

3. Independent of the question of location, is the Osterling plan one to which the taxpayers, plaintiff, have the right to

object on the ground that it provides a building in excess of the reasonable requirements of the county as to size, arrangement and cost?

The consideration of the first question involves, necessarily, a brief review of the local history, which will throw light on the origin, purpose and use of the square, and the nature of the dedication, by virtue of which it exists.

Under the Connecticut settlement of the Wyoming Valley, the township of Wilkes-Barre was first surveyed and laid out by David Meade in 1770. In 1773, the town plot, of what afterwards became the borough of Wilkes-Barre, was laid out by Captain Durkee, and this plot shows the center square as an open space in the center of the town, upon which the streets were bounded.

In 1804, a certificate was issued by the commissioners, under the act of April 4, 1799, to Lord Butler, Matthias Hollenback and Jesse Fell, as the township committee, for two parcels of land in Wilkes-Barre, one being that known as the river common extending from South to Union streets, and the other being the public square. Diagrams of both these parcels of land are attached to the certificate, and they are further described as " draughts of two tracts of land situate in Wilkes-Barre, one of the seventeen townships in Luzerne county; one thereof being a square in the town plot thereof, and called the center square, and the other being the public common on the river bank, between the river Susquehanna and the town; which two lots or tracts of land are in the second division of that township, and contain thirty-nine acres and forty-one perches, with the usual allowance of six per centum for roads. Surveyed July 3, 1801, by order of the commissioners appointed for putting in execution an act of the general assembly of Pennsylvania, entitled ' An act for offering compensation to the Pennsylvania claimants for certain lands within the seventeen townships in the county of Luzerne, and for other purposes therein mentioned, for Lord Butler, Matthias Hollenback and Jesse Fell, the township committee.'

(Signed)                    " THOS. SANBOURNE,
                    " Surveyor to the said Commissioners.
" To SAM'L COCHRANE, ESQ.,
    " Surveyor General.
    " January 2, 1804."

The borough of Wilkes-Barre was created by an act of assembly of March 17, 1806, P. L. 529, and this act provides "that the town plot of Wilkes-Barre . . . . be and the same is erected into a borough," etc. The title of the town committee was afterwards conveyed to the borough, and a patent granted for the square. The change of the borough into the city of Wilkes-Barre made no change in the status of the river common or the public square.

The county of Luzerne was erected out of the northern part of Northumberland by the act of assembly of September 25, 1786.

Assuming that the space known as the center square was dedicated to public use by virtue of the original survey of the town in 1773, it is to be observed that the square antedates the county by thirteen years. What is a dedication? The most comprehensive definition of the law writers is that "dedication is the giving of land, or an easement therein, for the use of the public by the owner." And in the leading case of New Orleans v. The United States, 10 Peters, 662, it was said by the Supreme Court of the United States that "it is not essential that the right of use should be vested in a corporate body. It may exist in the public, and have no other limitation than the wants of the community at large." And this law of dedication applies to public squares and commons: Post v. Pearsall, 22 Wend. 425; Com. v. Bowman, 3 Pa. 203; State v. Wilkinson, 2 Vt. 480. And the dedication is to all the people, to the whole public, not of a county, but of the commonwealth. The doctrine of the law on this point is fully stated from the cases cited in 9 Am. & Eng. Ency. of Law, p. 23, as follows: "There can be no dedication to private uses, nor even to uses public in their nature, but the enjoyment of which is restricted to a limited part of the public." See also Com. v. Alburger, 1 Whart. 469, and Princeville v. Auten, 77 Ill. 325. It was said by Judge GIBSON in Com. v. Bowman, 3 Barr, 202, that "a county has no inherent right of property in a public square which has been dedicated not to its use only, but to the use of all the citizens of the commonwealth. Such a public square is as much a highway as if it were a street, and neither the county nor the public can block it up to the prejudice of the public or an individual."

The claim of the county in the present case to occupy the entire area of the public square for the new courthouse, must, in

view of the legal principles already referred to, be rested exclusively upon the right vested in her by the legislature of the state. And we therefore now proceed to a consideration of that branch of the case under our first general division of the subject.

By an act of assembly of April 2, 1856, the commissioners of Luzerne county were authorized to erect a new courthouse, and to locate it in or near the public square of the borough of Wilkes-Barre. See P. L. 1856, p. 225. Previous to this, by an act of May 5, 1855, the council of the borough of Wilkes-Barre had been authorized to issue bonds, not less than $10,000, and not more than $20,000, to be applied toward the payment of the cost of erecting a new courthouse. And this act contained a proviso that such new courthouse should be erected in the center of the public square. Under these acts the present courthouse was erected, and about one third of the total area of the public square was occupied. The right or title vested in the county by this legislation was in the nature of an easement. The legal definition of an easement is "a right which one proprietor has to some profit, benefit or beneficial use out of, in, or over the estate of another proprietor." It is essential as a quality of an easement that there shall be two distinct tenements, the dominant to which the right belongs, and the servient upon which the obligation is imposed. It is a further essential of an easement that it be founded upon a grant by deed, or upon prescription which supposes one. It has been held, however, that a special statute may authorize the creation of a public easement. Among the incidents to easements based upon the decisions of some of our higher courts, we call attention to a few which seem to apply to the case now under consideration.

In Minneapolis Western Ry. Co. v. Minneapolis, etc., Ry. Co., 58 Minn. 128, it was said: "The law is jealous of a claim to an easement and the party asserting such a claim must prove his right to it clearly. It cannot be established by intendment or presumption." In Race v. Ward, 82 English Common Law Rep. p. 713, Lord CAMPBELL quotes, with approval, a decision by the House of Lords, in Dyce v. Lady James Hay, 1 McQueen's Scotch App. Cases, 305, in which the Lord Chancellor said: "Neither by the law of Scotland nor of England can there be a prescriptive right in the nature of a servitude, or

easement, so large as to preclude the ordinary uses of property by the owner of the lands affected." In Jaqui v. Johnson, 27 N. J. Eq. 526, the court of appeals of New Jersey, by Judge KNAPP, said : "It is the exclusive right of the owner of the servient tenement, suffering the burdens of an easement, localized and defined, to say whether or not the dominant owner shall be permitted to change the character or plan of the servitude." In Jennison v. Walker, 11 Gray, 423, it was held that " where the right to an easement is granted, without giving definite location and description to it, the exercise of the easement in a particular course or manner, with the consent of both parties, renders it fixed and certain, and the dominant owner has no right afterwards to make changes affecting its location, extent or character."

There are some reported cases in the books which seem to intimate an almost unlimited power in the legislature to divert public squares to other uses than those originally intended. Such a case, in our own state, was that of Baird v. Rice, 63 Pa. 489, involving the occupancy of Penn Square in Philadelphia, for new public buildings. When carefully analyzed, however, it will be found that the facts and the rules of law held applicable to them do not create a precedent for the present case. The dedication by William Penn was of a plot of land laid out specifically " for buildings for public concerns," and the court rested their conclusion in favor of the building on the ground that they were carrying out the express purpose of the dedication. The doctrine of this case was that, when not inconsistent with the purposes of the dedication, a state legislature may authorize the erection of county and municipal buildings upon land dedicated to a public square. Whether the legislature has the power to grant to a municipal corporation like a county, the right to take and occupy with a county courthouse the whole of a plot of land solemnly dedicated to the use of the people of the state as a public square, for purposes of health, amusement and recreation, may well be doubted, and the fact that no instance of the kind is recorded in any adjudicated case certainly tends to emphasize the doubt. The reasonable necessity which would justify the county of Luzerne in enlarging the courthouse facilities upon the present site should have reference not only to the wants of the county for

a courthouse, but also to the rights of the greater public for
an open square.   But it is not necessary in the present case to
definitely fix the limit of legislative power in the direction re-
ferred to.   For here there has been no legislation which con-
templated or authorized the taking of the whole square, and its
diversion to a new use and one different from that to which it
was dedicated.   If, as appears clear from the authorities already
referred to, an easement cannot be established or enlarged by
intendment or presumption, but must be clearly evidenced by
the terms of the grant, what claim can the county have to more
of the square than she has occupied and been content with for
nearly fifty years ?

In Mahon v. Norton, 175 Pa. 279 ; 8 Kulp, 249, Judge SEARLE
held that " the county commissioners of Luzerne county have
the right to erect upon this square upon the location of the
present courthouse, a new one, sufficient in size to accommo-
date the business of the county."   The Supreme Court affirmed
this judgment in a per curiam opinion, but it must be observed
that the question in that case was not identical with the one
now under consideration.   The prayer of the bill was " to re-
strain the county commissioners from using or occupying any
part of the public square for the erection of a courthouse, and
particularly any part not so occupied at the present time."   The
exact nature of the title of the county to the square, and the
necessary limitations upon that title imposed by the original
dedication to the use of the public was not considered.   The
casual observation of GIBSON, C. J., in Commonwealth v. Bow-
man, that it had been the custom in Pennsylvania " to allow
the county reasonable accommodations for its courthouse and
offices " upon the public squares of the county towns, was not
intended to mean that the public squares could be entirely
blotted out and closed up.   A careful reading of the whole
opinion, and of the question then under consideration, will
show that any other construction of that case is imperfect, mis-
leading and superficial.

We come now to the second question in the case.   Have
the county commissioners the legal right to take down the
present courthouse in which the records of the county are
kept, and remove the records to other buildings not fireproof
or secure for such a purpose, pending the erection of the new

courthouse, and if they have the right so to do, would its exercise, under the circumstances, be within the limits of a sound discretion?

The custody and safekeeping of the public records is a high trust. When once securely lodged in the place provided for them by the law, they are not to be removed or tampered with. The Act of April 15, 1834, Pur. Digest, 437, pl. 26, provides that "it shall be lawful for the commissioners of any county, having first obtained the approbation of two successive grand juries and of the court of quarter sessions of such county, to cause to be erected at the seat of justice thereof, when occasion shall require, such building or buildings as may be necessary for the accommodation of the courts and of the several offices of the county and for the reception and safekeeping of the records and other papers in charge of such officers," etc. The act of April 24, 1879, provides that "whenever the courthouse or place appointed by law for holding any of the courts in any county of this commonwealth shall at any time be unsafe, shall have been destroyed or under repairs, it shall be the duty of the county commissioners of such county to procure some other convenient place at the county seat, to be approved by the court of said county, for holding such courts."

The present courthouse, at the time of its erection, was regarded as a fireproof building, and the contract for its erection called for such a structure. The address at the laying of the corner stone of the new building in 1856, was delivered by Hon. JOHN N. CONYNGHAM, then the president judge. He devoted considerable time to a description of the building, and calls particular attention to the fact it is to be fireproof, congratulating the people of the county upon the fact that now their public records are to be safely guarded and securely kept. What authority of law have the county commissioners for removing the records from such a building to others neither fireproof nor in any way fitted or intended for such use, but adapted either to the purposes of a public hall or an ordinary grocery or dry goods store? The only contingencies mentioned in the statute which will justify the commissioners in the removal of the records are when the courthouse shall be "unsafe, or shall have been destroyed, or under repairs." Neither of these events has happened. The necessity for taking down the present court-

house does not exist. Another locality for the courthouse is available without expense to the county. Why should not the records remain where they are until a new and more commodious structure has been erected, and thus avoid the expense of renting other buildings and of two removals of the records themselves? But aside from any narrow or merely technical view of the subject, what is the true and the common sense aspect of the case which should govern the commissioners in the exercise of a sound discretion in reference to the public records? This question must be answered in the light of the evidence.

The testimony in the case shows that there are upon record in the recorder's office of Luzerne county almost 150,000 deeds and conveyances, and about 40,000 mortgages. In the prothonotary's office there are upon the continuance dockets, including equity cases and mechanics' liens, about 250,000 cases. In the register's office there are upon record 5,000 wills, and in the clerk's office dockets containing the proceedings in the orphans' court in the settlement of some 15,000 estates. In the recorder's office there are 390 deed books, and 137 mortgage books written up. In the prothonotary's office they are now using the 173d continuance docket. Besides these are the judgment index dockets, the mechanic's lien books and other indexes. And then there are the almost endless records and files of the commissioners' office, and those of the clerk of the quarter sessions, of the treasurer and of the sheriff.

The injury to the people of the county in the event of the loss or destruction of these records would be simply irreparable and appalling. The evidences of the title deeds to their homes; of the securities which vouchsafe their investments; of the last wills and testaments of their ancestors; of the liens which the mechanics hold upon the buildings which represent their labor; of the roads and highways which permit the movement of the people from place to place; of the naturalization which confers upon the foreigner the rights of American citizenship—all these and many other of the most valued rights of our people are guaranteed by the witness of these mute memorials, known as the records of the county. It is alleged in the bill and established by the evidence in the case, that there does not exist in the city of Wilkes-Barre, at the present time, any building suit-

able for holding the courts of the county, or for safely depositing the records during the interval which must elapse between the demolition of the old and the erection of the new courthouse. Under these circumstances it seems clear that the courts should continue to be held and the records retained in the present building until the completion, upon another site, of the new structure. The discretion vested in the county commissioners is not without a limit. It must be a wise and sound discretion, and must be exercised not in defiance of public policy, but with a careful and scrupulous regard for it. If persuasion and reason fail, then stubborn resistance and inordinate self-confidence must be restrained by the strong arm of injunction.

It remains to consider the third question raised by the bill, answer and proofs, which is this: Independent of the question of location, is the Osterling plan one to which the taxpayer, plaintiff, has the right to object on the ground that it provides for a building in excess of the reasonable requirements of the county as to size, arrangement and cost? Thirty or more plans were submitted, by as many different architects, to the county commissioners in response to their notification that a courthouse was to be built. Two of the commissioners decided in favor of the Osterling plan. The third commissioner dissented from this decision, alleging that the Osterling plan was not the better one, and furthermore, that its approval was obtained by unfair, if not corrupt, methods resorted to by the architect and the two commissioners acting in collusion. In order to be more fully informed the judges referred the matter to a committee of the bar. This committee reported that while they personally preferred another one of the plans submitted, the Osterling plan would be their second choice. And in reference to the charges of fraud and collusion, they found them not sustained by the evidence. The Osterling plan and the report were then submitted to the judges, who confirmed the report of the committee and approved the Osterling plan. It is now claimed by the defendants that this approval was a final adjudication, and that the court has not the jurisdiction to inquire further, as they are now asked to do in this proceeding, for an injunction. Speaking now for myself alone, and not for my learned colleagues, I do not believe that our approval of the Osterling plan can be construed to prevent the taxpayers of the county

from showing, if they can, that the plan contemplates a building greater in size and more expensive in cost than is reasonably necessary, and, therefore, calling for the restraint of an injunction.    The doctrine of res adjudicata does not apply to the case, because the parties plaintiff were not a party to the proceedings, and, as to them, there has been no judgment.    Before a plea of res adjudicata can be sustained it must appear that there has been a trial at which the party appeared, or was bound to appear, that he was duly warned, had his day in court, and was defeated.    Any rule or proceeding whereby a man's property is swept away from him without a hearing, trial or judgment, or the opportunity of making known his rights, is not according to the law of the land within the meaning of the 9th section of the Declaration of Rights : Brown v. Hummel, 6 Barr, 86 ; McAuley's Appeal, 77 Pa. 397 ; O'Hara v. Stack, 90 Pa. 490 ; Ervine's Appeal, 16 Pa. 256.    It is upon the ground that the parties have been heard, or have had an opportunity of hearing, that the law gives so conclusive an effect to matters adjudicated : St. Clair v. Cox, 106 U. S. 350 ; Ex parte Schollenberger, 96 U. S. 369 ; 21 Am. & Eng. Ency. of Law, 261. But aside from the strictly technical view of the question, we are of the opinion that the taxpayers should not be refused an opportunity to show that the plan adopted provides for a larger and more expensive structure than either the present or prospective necessities of the county justify or require.    There is no imputation of corrupt motive or of official malfeasance on the part of the county commissioners, in this effort of the plaintiffs to restrain them from what is alleged to be an excessive outlay of the money of the people.    And I do not believe that the commissioners, themselves, as the representatives of the people of the county, will insist upon the erection of a courthouse in exact accordance with the approved plan, if the testimony of competent and well informed witnesses shows conclusively that certain modifications of the plan are entirely possible without detriment to the main purpose, and are at the same time responsive to the dictates of an enlightened economy.    And at this point we call attention to a rule adopted by the commissioners when the original advertisement for plans was made public.    It is Rule 14 and reads as follows : " The commissioners reserve the right to modify the plan which may be adopted in said com-

petition, and to call for such additional drawings as the modifications may require." And this brings us to the consideration of the evidence tending to show that the building proposed by the plan will be larger and more expensive than reasonably required.

The testimony taken on this branch of the case may be grouped under two heads, first, that relating to rooms or apartments which it is claimed should be entirely omitted; and, secondly, that relating to the size of the rooms which must be provided for the holding of the courts, and for the different county officers having charge of the records and the business of the county. In disposing of this part of the case we have not adopted the more extreme views entertained by the witnesses for one side and the other, but have endeavored to reach conclusions which appear fair and reasonable. And first in reference to unnecessary rooms we are of the opinion:

1. That one court room may be omitted, leaving the entire number of court rooms five instead of six.

2. The judges' rooms may be reduced to four, or one for each judge, instead of one for each court room, as provided by the plan.

3. The rooms designated as the controller's storage room, the private office of the county surveyor, in addition to the one marked county engineer. One room is sufficient.

4. The room designated as the county superintendent's private office.

5. The building superintendent's room.

6. The coroner's private office.

7. The sheriff's storage room.

8. The rooms designated as "unassigned."

9. The sheriff's transcribing room.

10. The lawyers' rooms, one for each court room. One room, in addition to those of the library and law association, would suffice.

As to the size of the rooms, first, the space allotted to the prothonotary's office is one third larger than the present court room No. 1. While this office should have ample room for the transaction of business, and the storage of books and papers, we are of the opinion that, in view of the fact that a storage room is also provided, this room might be greatly reduced in

size without detriment to the public interests. Second. The controller's office, by the plan, is forty-two by fifty-four feet. This might be reduced at least one third. The office of the county treasurer is forty-two by fifty-four feet. This also should be reduced one third.

We append a tabular statement, based upon the testimony in the case, showing the space devoted to the different offices in the proposed new building, as compared with those in the present building.

DIMENSIONS OF COURTHOUSE BUILDINGS.

| Square feet of Office. | New Building. | | Old Building. | | Excess of New over Old. |
|---|---|---|---|---|---|
| Prothonotary's, | 52×84 | 4,368 | | | |
| | 16×22 | 352 | 19×36 | 684 | |
| | 10×14 | 140 | 19×36 | 684 | |
| | Total, | 4,860 | | 1,368 | 3,492 sq. ft. |
| Recorder's, . | 52×84 | 4,368 | | | |
| | 16×22 | 352 | 19×36 | 684 | |
| | 10×14 | 140 | 15×19 | 285 | |
| | Total, | 4,860 | | 969 | 3,891 sq. ft. |
| Treasurer's, . | 42×54 | 2,268 | | | |
| | 10×14 | 140 | 15×19 | 285 | |
| | Total, | 2,408 | | 285 | 2,123 sq. ft. |
| Commissioners', | 49×54 | 2,646 | | | |
| | 30×34 | 1,020 | | | |
| . | 16×22 | 352 | 19×36 | 684 | |
| | 10×14 | 140 | 15×19 | 285 | |
| | Total, | 4,158 | | 969 | 3,189 sq. ft. |
| Controller's, . | 42×54 | 2,268 | | | |
| | 10×14 | 140 | 19×24 | 456 | |
| | Total, | 2,408 | | 456 | 1,952 sq. ft. |
| Sheriff's . . | 35×54 | 1,890 | | | |
| | 30×34 | 1,020 | | | |
| | 16×22 | 352 | | | |
| | 10×14 | 140 | 12×18 | 216 | |
| | Total, | 3,402 | | 216 | 3,186 sq. ft. |

| Square feet of Office. | New Building. | | Old Building. | | Excess of New over Old. |
|---|---|---|---|---|---|
| District Att'y, | 16 ×18 | 288 | | | |
| | 16 × 22 | 352 | | | |
| | .16×16 | 256 | 12×15 | 180 | |
| | Total, | 896 | | 180 | 716 sq. ft. |
| Clerk of the | 42×54 | 2,268 | | | |
| Courts, | 16 ×16 | 256 | 19 × 23 | 437 | |
| | Total, | 2,524 | | 437 | 2,087 sq. ft. |
| Register's, | . 42×54 | 2,268 | | | |
| | 14×15 | 210 | | | |
| | 16 ×16 | 256 | 19× 23 | 437 | |
| | Total, | 2,734 | | 437 | 2,297 sq. ft. |

Height of new building, 75 feet.

Height of dome of new building, 175 feet.

Exterior size of new building, 190 ×190 feet.

Floor space, old building, 22,000 square feet.

Floor space, new building, 80,000 square feet.

Fifty-eight thousand more square feet in new than old building. It is nearly four times as large.

The testimony before shows that the omission of the rooms found to be unnecessary, and the reduction in size of those which are unreasonably large, would lessen the size of the whole building to one third of that contemplated by the plan, and the total cost of the building in about the same amount.

Having considered, in their purely legal aspect, the various questions involved in this case, I venture, in conclusion, to express the hope that the commissioners of the county will decide, without further litigation, to place the new courthouse elsewhere than upon the public square. The custom of building courthouses upon the center square of our towns was not an unreasonable one in the primitive times when the need of public parks for recreation and rest had not been felt. But when the village has grown into the city, and the public square in the center of the town has become the focal point of business, it ceases to be the natural or proper place for the location of the courts. The people of the whole county, and not those of the city alone, are interested in having their legal business con-

ducted in an orderly, dignified and expeditious manner.    There is no form of noise and interruption which does not culminate upon our public square.    Several times during each year the sessions of the court are broken up by the blare of bands and the passage of parades.    Street preachers and singers, organ grinders and vendors of patent medicines make it their favorite rallying point.    The trolley cars come and go incessantly.    Vagrants and idle people wander in its hallways, or float into the court rooms which are open to all comers.    In fact the public square of a large and growing city is, in all respects, the wrong place for the courthouse of a great county like Luzerne.    I have spent my entire life in this county, and a good part of it in its courts in the service of the people who have honored me with their confidence.    I speak, therefore, not without experience, and certainly without any personal interest, when I declare my conviction, that to put a new and handsome courthouse upon the little plot of land which was dedicated to the public for their use and enjoyment as an open space, and to blot it out forever, would be a blunder without an excuse, and a wrong without a remedy.

The injunction is granted as prayed for in the bill, and counsel are requested to prepare and submit a final order and decree in accordance with this opinion.

*Error assigned* was the decree of the court.

*George S. Ferris* and *John T. Lenahan*, for appellants.—The injunction requires the county commissioners to violate a duty imposed upon them by statute : Appeal of Commissioners of Northampton County, 57 Pa. 452 ; Com. v. Marshall, 3 W. N. C. 182 ; Bennett v. Norton, 171 Pa. 221.

The injunction involves the reversal by a single judge, in a collateral proceeding, of the action of the judges of the common pleas, in their performance of a statutory duty : Billings & May v. Russell, 23 Pa. 189 ; Eichman v. Hersker, 170 Pa. 402.

The injunction rests upon the assumption that the county commissioners have no right to do what this court has decided that they have a right to do : Mahon v. Luzerne County Commissioners, 175 Pa. 279 ; Com. v. Marshall, 3 W. N. C. 182 ; Hill v. Commissioners of Kensington, 1 Parsons, 501 ; Find-

ley v. Pittsburg, 82 Pa. 351; Warfel v. Cochran, 34 Pa. 381; Douglass v. Com., 108 Pa. 559; High on Injunctions, sec. 1240; Com. v. Bowman, 3 Pa. 202; Com. v. Rush, 14 Pa. 186.

The conclusiveness of a former adjudication depends upon the indentity of the rights involved. A point which might have been made on a former trial is concluded by the judgment therein whether actually made or not: Myers v. Kingston Coal Co., 126 Pa. 582; Breckwoldt v. Morris, 149 Pa. 291; Myton v. Wilson, 11 Pa. Superior Ct. 645; Becker v. Lebanon, etc., Street Ry. Co., 11 Pa. Superior Ct. 649.

The action prevents action by the lawful authorities in a lawful way, to supply a public need made apparent in the manner prescribed by law.

*H. W. Palmer*, with him *D. L. Rhone*, for appellee.—The county commissioners have no authority to occupy substantially the whole of the public square in the city of Wilkes-Barre with a courthouse: Mahon v. Norton, 175 Pa. 279; Com. v. Alburger, 1 Wharton, 469; Com. v. Rush, 14 Pa. 192; Penny Pot Landing v. Philadelphia, 16 Pa. 79; Price v. Thompson, 48 Mo. 361; Rutherford v. Taylor, 38 Mo. 315; Warren v. Lyons City, 22 Iowa, 351.

The building which the commissioners propose to erect is in excess of the reasonable requirements of the county as to size, arrangement and cost: St. Clair School Board's App., 74 Pa. 252; Conners's App., 103 Pa. 356.

The commissioners have no legal right to remove the records to other buildings not fireproof or secure, pending the erection of the proposed new courthouse, or, if they have such a right the exercise of it, under the circumstances of this case, is not within the limits of a sound discretion.

OPINION BY MR. JUSTICE MITCHELL, July 11, 1900:

The very interesting question suggested by the opinion of the learned judge below, whether even the legislature can divert public property dedicated to a specific public use to another and wholly different use, though also public, is not necessarily presented in this case. The title to spaces left open by the original plans of towns or by subsequent general dedication for similar purposes is in the commonwealth for the benefit of the

whole public, and the uniform course of decision has been that central squares in the laying out of towns were meant as much, perhaps primarily more, for public buildings than to secure space, and therefore the commonwealth may authorize their occupation in that manner without altering their original use.

When our forefathers were gathering here and there into little centers of population and business, they paid small attention to what is now known and valued as breathing space. That was all around them in the neighboring wilderness, and what they sought was concentration for mutual protection and convenience. It was said by Justice ROGERS in Kung v. Shoneberger, 2 Watts, 23, that " in this state there are few ancient towns in which squares such as this do not form part of the plan. They are generally located at the intersection of the streets; and are intended as sites for the erection of buildings for the use of the public; such as courthouses, market houses, school houses and churches; sometimes they are designed as ornaments; and at others they are intended for the promotion of the health of the inhabitants by admitting a free circulation of air." See also Com. v. Bowman, 3 Pa. 202, Com. v. Rush, 14 Pa. 186, and Com. v. Beaver Borough, 171 Pa. 542. These cases are ample authority for holding that the occupation of a public square of the kind referred to by a public building is part of, or at least germane to, the use for which it was originally dedicated. We are, therefore, unable to agree with the learned court below that the proposed occupation of the square by a new courthouse is such an enlargement of an easement to the county of Luzerne as can only be authorized by a further specific grant from the commonwealth.

It must therefore be accepted as settled by the decision in Mahon v. Norton, 175 Pa. 279, that the county commissioners of Luzerne county when authorized by the proper proceedings of the grand jury and the court " have the right to erect and maintain on the public square in the city of Wilkes-Barre upon the location of the present courthouse, a new and enlarged courthouse of sufficient size to accommodate the business of the county."

This brings us to the consideration of the authority of the county commissioners as shown in the present case.

By the Act of April 15, 1834, P. L. 539, sec. 10, " It shall be

lawful for the commissioners of any county having first obtained the approbation of two successive grand juries, and of the court of quarter sessions of such county, to cause to be erected at the seat of justice thereof when occasion shall require, such building or buildings as may be necessary for the accommodation of the courts and of the several officers in the county, and for the reception and safekeeping of the records and other papers, in charge of such officers, and also such other building or buildings, as may be necessary and proper for the purposes of a county jail and workhouse, and if need be to purchase ground for the erection of such buildings." By this act the determination of when "occasion shall require" the buildings, was vested in the two successive grand juries and the court of quarter sessions, and their approval was complete authority to the commissioners to proceed: App. of Comrs. of Northampton County, 57 Pa. 452. Whether it was mandatory on them has not been decided by this court, but an elaborate opinion in the affirmative was given by the common pleas of Beaver county in Com. v. Marshall, 3 W. N. C. 182. But whether mandatory or not, the occasion having been determined to exist, the mode of meeting it, the size, style, arrangement, cost and location of the building were left to the discretion of the commissioners.

But by the Act of April 19, 1895, P. L. 38, "whenever the commissioners of any county are authorized and required to erect a courthouse, jail, or other county buildings, they shall submit the plans and specifications adopted by them to the judges of the court of common pleas of the proper county for their approval, and when it is obtained they shall let the work by contract . . . . which contract or contracts shall be made subject to the approval of the said judges." By this act the control of the commissioners over the details of the execution of the projected improvement, theretofore without other limitation than the common-law remedies against abuse of discretion, was made subject to the supervision and approval of the court. The act names only the plans and specifications and the contracts as requiring submission, but these necessarily involve the size, arrangement, cost, location and other details as well, for no intelligent exercise of the power of approval is possible without a consideration of all these elements. The most desirable size

or arrangement may be rendered undesirable by its undue cost or by its want of adaptability to the most desirable location. The statute puts on the court the duty of .approval or disapproval of the projected building, and in so doing its plain intent is to give the court the final authority over all the essential elements of the completed undertaking.

The occasion for a new courthouse in Luzerne county appears to have been determined in accordance with the act of 1834 by the action of two successive grand juries approved by the court of quarter sessions. And the plan adopted by the commissioners has also been submitted to and approved by the court of common pleas but apparently not in the manner required by the act of 1895. The very important element of location, unfortunately the one most in controversy, was not included in the submission to the court. I find in the notes of testimony that when the proceedings in the court of common pleas, No. 698, May term, 1899, were offered in evidence in the present suit they were objected to by the appellee as irrelevant and immaterial, but were admitted by the court, " the effect to be passed on later," with the further remark of counsel for appellee that at the time of the approval of the plans the question of location was not before the court directly or inferentially. And it was said at the argument here, without challenge, that the court below had not approved the plan with reference to the location, and would not do so. Under these circumstances it is clear that the commissioners have not yet obtained the complete authority to proceed, required by the act of 1895.

It is not necessary in the present status of the case to consider the other grounds on which the .injunction was awarded, the unnecessary size and expense of the proposed building, and the unnecessary danger to which the county records would be subjected. Even under the act of 1834 the discretion of the commissioners was within the supervision of the court so far as to prevent its abuse. If the judges should hereafter under the act of 1895 approve the plan, size, etc., with reference to a particular location, the question might afterwards arise whether the same judges sitting as a court in a case brought regularly before them, might reach a different decision. It was held in Comrs. of Northampton's Appeal, 57 Pa. 452, that the court could not of its own motion withdraw its approval and enter a

new order suspending further proceedings. But that decision may be readily sustained on the general principle that a court cannot of its own motion reverse its judgment and enter a new one after the term. Interest reipublicae ut sit finis litium. But that is a different thing from reopening a decision or considering the subject-matter again on the motion of a party interested who has never had a day in court. The approval of a plan by the judges under the act of 1895 though done virtute officii is not strictly a judgment on lis mota between competent parties. It is beyond doubt that notwithstanding such approval the court would be bound to entertain a taxpayer's bill to show that the proposed building would involve an increase of the municipal debt beyond its constitutional limit, and perhaps on other grounds. These questions we leave to be considered when they necessarily arise. For the present we merely hold that the injunction must be sustained for want of complete authority in the commissioners to proceed.

It is greatly to be desired that an amicable agreement should be reached, which would terminate the controversy that blocks the accomplishment of what seems to be a conceded need. There is very great force in the remarks of the learned president judge of the court below that the noisy and bustling business center of the town is not intrinsically the best place for the courthouse, and in these days when the enlightened sentiment is everywhere growing that the serried ranks of buildings separated only by party walls and narrow streets should be broken by open spaces for light and health and enjoyment, it is strange indeed to find the most picturesquely beautiful city in the commonwealth tolerating the idea of closing up still further its central breathing spot. But these are matters which its own citizens must settle. They are far more interested than any outsiders, though the latter like other onlookers may sometimes see the points of the game more clearly than the players.

Decree affirmed with costs.