Hoffman et al., *v.* Pittsburgh et al., Appellants.

Argued May 23, 1950. Before DREW, C. J., STERN, STEARNE, JONES and BELL, JJ.

*Albert D. Brandon,* Assistant City Solicitor, with him *Anne X. Alpern,* City Solicitor, for appellants.

*Joseph A. Beck,* with him *Frank W. Stonecipher,* for appellees.

OPINION BY MR. JUSTICE BELL, October 2, 1950:

The City of Pittsburgh on July 11, 1947, adopted Ordinance No. 263 of 1947 pursuant to the Act of Assembly of July 2, 1937, P.L. 2793, 53 P.S. §1331-3. This Ordinance authorized the City to acquire a fee simple title to Diamond Market House and the land on which it is erected, known as Diamond Square, and to sell the said property to the highest responsible bidder *for private use;* and steps were taken to consummate said sale. Plaintiffs filed a bill in equity to enjoin the proposed sale. The original plaintiff brought his action as a resident and taxpayer and as a farmer who sold his produce at the Diamond Market House and on behalf of other farmers similarly situated. The intervening plaintiffs are owners of a lot fronting on Diamond Square.

The lower court held that the City of Pittsburgh had no estate or title in or to the property known as Diamond Square; that the aforesaid Act of 1937 did not apply to property in which the City had no estate;

that the aforesaid City Ordinance passed pursuant to said Act was illegal and void; and granted an injunction restraining the City from proceeding to acquire a fee simple title to Diamond Square and from selling said land under said Ordinance.

Diamond Square is a strip of land about 260 by 280 feet, an area of seventy-two thousand eight hundred square feet, located at the intersection of Market and Diamond Streets in the First Ward of the City of Pittsburgh. This square was laid out in 1784 in the original plan of the Town of Pittsburgh drafted by Colonel George Woods, surveyor, acting for John Penn and John Penn, Jr., the then owners of the land; and lots fronting on Diamond Square were sold pursuant to said plan. When the original plan of the Town of Pittsburgh was laid out, neither the City or Borough of Pittsburgh nor the County of Allegheny were in existence. There is no other specific evidence that this tract of land was dedicated as a public square or otherwise, or that there was a formal acceptance of a dedication; however, it is agreed by the parties herein that because contemporaneous deeds refer to Diamond Square as a public square and because of the decision of Judge Stowe in *Holmes v. City of Pittsburgh,* 35 P.L.J. 491, in 1888 *the law has conclusively presumed a grant from the original proprietor for public square purposes.*

On July 8, 1794 the Borough of Pittsburgh, the predecessor of the City of Pittsburgh, authorized the erection of a public market house and market stalls on the easterly half of this square. In 1795 the County of Allegheny erected on the westerly half of the square a Court House which was maintained and occupied as such until 1836. A new Court House having been erected, on August 11, 1841 the Commissioners of Allegheny

County sold the "Old Court House building and offices" at public auction to one William Eichbaum, who assigned all his right, title and interest in the building to the City of Pittsburgh by an instrument dated August 18, 1841. On November 10, 1841 the Commissioners of Allegheny County transferred to the City of Pittsburgh all its right, title and interest in the Diamond Market "for such Estate and under such conditions as the said County of Allegheny at the time of the sale aforesaid had and held the same."

In 1852 a new building was erected by the City on the westerly portion of the square; the first floor was used by the City as a City Hall and the second floor as a public meeting house. In 1868, a new City Hall having been built, the first floor was used for market purposes in addition to the market house on the easterly half of the square.

In the course of time Market Street became extended through Diamond Square and the market house occupants encroached on Market Street and interfered with traffic. The case of *Holmes v. City of Pittsburgh*, 35 P.L.J. 491, followed and Judge Stowe held that it must be concluded that Diamond Square had been dedicated as a public square "to be used for the purposes to which such squares were usually dedicated, such as market-houses, court-houses, or other public buildings"; that it had been so long used for purposes "consistent with the dedications of such squares to public uses in this State" that "the law will now conclusively presume a grant from the original proprietor for such uses." The City could therefore maintain its market houses "as now erected" but it was enjoined from interfering with that portion of the square, being a continuance of Market Street, which was used as a public street or highway.

In 1914 Diamond Street was opened through the square and the City erected a new market house con-

sisting of four units of two stories and a mezzanine floor each, joined together by an archway over Diamond Street and a bridge over Market Street. The City of Pittsburgh operated the market house until 1936 when it entered into an agreement with the Pittsburgh Market House Protective Association under the terms of which that Association operated the market house and paid rent to the City. This arrangement has continued to the present; the last agreement being executed in 1941 and expiring in 1946.

Diamond Square became a financial burden and the City fathers being in need of revenue decided to sell it to the highest bidder. From an injunction restraining the sale, the City has appealed.

We shall first dispose of defendant's preliminary contention that plaintiffs have no standing in equity. This is without merit: *Trustees of Philadelphia Museums v. Trustees of University of Pennsylvania,* 251 Pa. 115, 96 A. 123; *Mahon v. Luzerne County,* 197 Pa. 1, 46 A. 894; *Commonwealth v. Connellsville Borough,* 201 Pa. 154, 50 A. 825. The right of the intervening plaintiffs as owners of lots fronting on Diamond Square is particularly clear. In *Commonwealth, v. Connellsville Borough,* 201 Pa. 154, 158, 50 A. 825, Mr. Justice MITCHELL said: ". . . the private complainants as purchasers of lots fronting on this public ground have a special interest in the use to which it may be put, in addition to the interest of the general public represented by the attorney general." A like interest applies to alienation as well as to use.

The next question of importance is whether the City of Pittsburgh has the power to alienate lands which have been dedicated to the public. The applicable principle of law is well stated in 3 Dillon, Municipal Corporations, 5th Ed., Sec. 1102: "A municipal corporation has *no implied or incidental authority to alien, or to dispose of for its own benefit, property dedi-*

*cated to or held by it in trust for the public use or to
extinguish the public uses in such property,*\* nor is
such property . . . or the proceeds of sale thereof
available for the payment of the debts of the munici-
pality."

This has been the law of Pennsylvania for over a
century: *Commonwealth v. Rush,* 14 Pa. 186; *Ormsby
Land Co. v. Pittsburgh,* 276 Pa. 68, 119 A. 730; *Com-
monwealth v. Alburger,* I Wharton 468; *Common-
wealth v. Bowman,* 3 Pa. 202; *Pittsburg v. Ep-
ping-Carpenter Company,* 194 Pa. 318, 45 A. 129; *Penn-
sylvania Mutual Life Ins. Co. v. Philadelphia,* 242 Pa.
47, 53, 88 A. 904; *Belovsky v. Redevelopment Author-
ity,* 357 Pa. 329, 340, 54 A. 2d 277; *Wentz v. Philadel-
phia,* 301 Pa. 261, 271, 151 A. 883.

In *Commonwealth v. Rush,* 14 Pa. 186, the City of
Allegheny in order to redeem certain certificates of
debt incurred in the construction of water works of
the City and for other public purposes, authorized by
ordinance of City Councils the sale of 40 lots at pub-
lic sale. These lots were part of certain land which had
been dedicated as a public square according to a plan
of the old town. Defendant purchased one of the lots
and commenced to erect a house thereon. A bill in
equity was filed by the Attorney General against the
Mayor of the City of Allegheny and the purchaser of
said lot and an injunction granted thereon by the court.
The court found that title to said land was by Act of
Assembly dated April 13, 1840 vested in the City of
Allegheny for such public uses as Councils might from
time to time direct and ordain.

The aforesaid injunctive decree was affirmed on the
opinion of the court below which said inter alia (page
189) : ". . . the usual mode of dedicating streets,
squares, &c. to the public, in this State, is simply to

---

\* Italics throughout, ours.

designate them on the plat or draft of the town as such, and if a square is intended, the purpose for which intended is there inserted; and this is a good and valid dedication, which will be binding on the parties concerned: 6 Pet. Rep., Barclay & Howell; id. 431; 10 Pet. 712; 6 Ohio 130. . . .

"The next question is—Have the city councils a right to sell and convey this property to individuals for private purposes?" . . .

". . . The pretence is, that because the proceeds of the sale of this square are applied to the public purpose of supplying the city with water, that, therefore, the city councils have designated this as the public purpose to which this square shall be applied. But this pretext is almost too barefaced to require a serious answer. It is not the proceeds of the square the uses of which the city councils are authorized to declare, *but it is the property itself which is vested in them for public uses, and to no private use can they possibly apply it. Their power over it is restricted and circumscribed; it is not theirs to sell or to dispose of; they may control it within their right, and designate the use, but can go no further. What difference is it to what use the proceeds are applied? The property is not theirs for sale.* The use to which it is to be applied is but a debt—the private debt of the corporation; and it is violating the first principle of a trust when the trustee attempts to apply the trust property to his own use or to make money out of it. The city authorities, therefore, had no right to sell this property, and the title of the purchasers derived from them is wholly defective, and can avail them nothing."

In *Ormsby Land Co. v. Pittsburgh et al.,* 276 Pa. 68, 119 A. 730, *the Court enjoined the city from leasing public property for private purposes.* Water Street was

laid out and dedicated to the public as a thoroughfare. The street was accepted by the City of Pittsburgh although never opened. Eighty years later the City leased said property, pursuant to a City Ordinance authorizing such action, to a private corporation at an annual rental of $1940. The Court sur a bill in equity by the owner of the fee in the land over which the street was laid out, restrained the City from using the land for other than highway purposes and declared the said lease void. The Court in its opinion said: "In the dedication of the street in question, the owner of the property apparently contemplated no use of the land within its limits, except for highway or other public purposes; at least nothing to the contrary appears in the record. Private property cannot be taken for private purposes and such would be the result in this case had the ordinance of the city authorizing a lease of the property been held valid. *Where land is dedicated for street purposes by the owner* and accepted by the municipality, such action is equivalent to a taking (10 R.C.L. 89, 91), and *the property so taken may not lawfully be applied to another and distinct purpose by the municipality unless it be a public use not inconsistent with its use as a highway.* In Sterling's App., 111 Pa. 35, 40, we said: 'By appropriating land for the specific purpose of a common highway, *the public acquires a mere right of passage* with the powers and privileges incident to such right. *The fee still remains in the landowner* notwithstanding the public have acquired a right to the free and uninterrupted use of the road for the purpose of passing and repassing; he may use the land for his own purpose in any way that is not inconsistent with the public easement. He may, for example, construct underneath the surface passageways for water and other purposes, or appropriate the subjacent soil and minerals, if any, to any use he pleases, provided he does not interfere with the rights of the pub-

lic. In other words, the only servitude imposed on the land is the right of the public to construct and maintain thereon a safe and convenient roadway, which shall at all times be free and open for public use as a highway.' In Dillon on Municipal Corporations, 5th ed., section 1176, it is said: 'Not even the legislature can authorize the condemnation of private property for other than a public use; hence the appropriation of a street to a private purpose cannot be justified even by legislative authority'."

*Commonwealth v. Alburger,* 1 Wharton 468, well illustrates the limits of a city's power. In that case *Franklin Square was dedicated to public use by William Penn.* In 1741 Thomas Penn conveyed a part of the property laid out as Franklin Square to a religious corporation for the purpose of a burying ground and it was so used until 1836. In order to raise the question of title, an indictment was found in 1836 against the Elders of the Church which received a conveyance from Thomas Penn. The Court held that when a square has been dedicated to public use neither the original owner thereof nor any successor in title could thereafter convey any part of said dedicated land to any person or corporation to defeat the vested right of the public. Mr. Justice SERGEANT in his opinion said (pages 484-485) : "When property is dedicated or transferred to public use, the use is indefinite, and may vary according to circumstances. *The public not being able themselves to manage or attend [to] it, the care and employment of it must devolve upon some local authority or body corporate as its guardian,* who are in the first instance to determine what use of it from time to time, is best calculated for the public interest, subject as charitable uses are, to the control of the laws and the courts, in case of any abuse or misapplication of the trust. *The corporation has not the right to these squares so as to be able to sell them, or employ them in a way variant*

*from the object for which they were designed;* but they may allow them to remain unimproved or unoccupied, while buildings are too remote to render it proper."

The City of Pittsburgh contends, however, that even though it may lack the power per se to dispose of dedicated land, the State Legislature may and by the Act of July 2, 1937, P.L. 2793, 53 P.S. §1331-3 has conferred authority upon it to dispose of such dedicated land. It is unnecessary to decide the broad question of legislative authority or whether a city may sell *for a private use* property which has been dedicated to the public; since we are of the opinion that there has been no legislative authorization for the city's acquiring title to or making any sale of the property known as Diamond Square.

The aforesaid Act of July 2, 1937 is entitled "An Act authorizing and empowering any city, county, school district, or other municipality which shall have acquired a *limited title* to real estate *for municipal purposes, to secure a title in fee simple* to any such real estate; and providing and regulating the procedure in such cases." Section 1 provides "Be it enacted, &c., That any city, county, school district, or other municipality shall have power, in the method herein prescribed, *to acquire title in fee simple* to any real estate to which such municipality shall have previously *acquired a lesser estate* in any manner; provided that such real estate shall have been used or held for a public purpose for a period of not less than ten years."

The City argues it has at least an easement in the property known as Diamond Square and that *an easement is a lesser estate* (than a fee simple) and therefore under said Act it can acquire a fee simple title to said property; and thereafter sell said property for a private use, on the twofold theory that a sale will produce more money for the taxpayers and that a dead hand cannot stop the progress or rehabilitation of a

great city. Emotional arguments cannot set aside settled principles of the law of property; and even if it were otherwise, future City fathers may feel that human values—air, light, rest, recreation and health which can be derived from any public square—are more important and valuable to the citizens of Pittsburgh· than the increased revenue which will likely be produced by a sale of this public property.

In order to determine the meaning and intent of said Act of 1937 which in the last analysis is the sole authority for the City's proposed sale, it is necessary to first determine who has title to said real estate and what title or estate the City of Pittsburgh has therein. Title to the property known as Diamond Square is vested in the Commonwealth of Pennsylvania with a reversionary interest in the heirs of John Penn and John Penn, Jr. *Mahon v. Luzerne County,* 197 Pa. 1, 46 A. 894; *Commonwealth v. Alburger,* 1 Wharton 468; *Ormsby Land Co. v. Pittsburgh,* 276 Pa. 68, 119 A. 730; *Commonwealth v. Bowman,* 3 Pa. 202; *Rung v. Shoneberger,* 2 Watts 23.

The court below correctly found that "The City of Pittsburgh has no estate or title in or to Diamond Square. All it has is the right to [regulate or] control [as trustee for the public who have a right of user or easement therein] the public use of the square, in the exercise of its police power, during inaction of the Legislature and of the County Commissioners."

The aforesaid Act of 1937 was never intended, in our opinion, to authorize a municipality to extinguish the public interest in lands which had been dedicated to public use. The title of the Act is significant in stating that it empowers a municipality to secure a fee simple title where the municipality "shall have acquired *a limited title* to real estate *for municipal purposes* . . . ." No title to real estate for municipal purposes

was ever acquired by the City of Pittsburgh; title, as we have stated, was vested in the Commonwealth for the use and benefit of the public at large. The title of a statute may be considered in the construction thereof: *Wiley v. Umbel,* 355 Pa. 206, 49 A. 2d 371; *Pavilonis v. Consolidated Home Furnishing Co.,* 352 Pa. 84, 42 A. 2d 67; *City of Philadelphia v. Scott,* 81 Pa. 80; *Halderman's Appeal,* 104 Pa. 251; *Yeager v. Weaver,* 64 Pa. 425; *Commonwealth v. Jordan,* 136 Pa. Superior Ct. 242, 7 A. 2d 523; Statutory Construction Act of May 28, 1937, P.L. 1019, Article IV, Section 54, 46 P.S. §554.

The City nevertheless contends that the title of a statute cannot restrict the body thereof; that this statute specifically allows a municipality to acquire title in fee simple *to any real estate* to which such municipality shall have previously *acquired a lesser estate;* that under said Act it can acquire a fee simple title *since it now has an easement or lesser estate;* that having acquired a fee simple title it can sell and dispose of said property for private use;* and that any owners of a reversionary interest are protected under said Act.

The precise question which first confronts the City is whether said Act of 1937 was intended to authorize it to acquire a fee simple title in lands which are owned by the Commonwealth.

"It is axiomatic that a statute is never presumed to deprive the state of any prerogative, right or property unless the intention to do so is clearly manifest, either by express terms or necessary implication. Baker et al. v. Kirschnek et al., 317 Pa. 225; Commonwealth v. Trunk et al., 320 Pa. 270; see 59 C.J. 1103, Sec.

---

* Section 3 provides that, "if the municipality shall have sold such real estate . . . the price or sum received . . . shall be prima facie evidence of the value of such real estate . . . ."

653." *Culver v. Commonwealth,* 348 Pa. 472, 475, 35 A. 2d 64.

In *Culver v. Commonwealth,* 348 Pa. 472, 475, 35 A. 2d 64, the question involved was whether the Commonwealth was compelled to pay interest in eminent domain proceedings. The Act of April 25, 1929, P.L. 777, as amended by the Act of March 26, 1931, P.L. 10, provided: "The amount of damages allowed in a report of viewers for the taking, . . . of property by the exercise of the right of eminent domain shall, . . . bear interest at the rate of six per centum per annum . . . ." The language of said Act was sufficiently broad and general to include the Commonwealth, yet the Court held that the Commonwealth was not included therein under the principle cited above. The Court in its opinion on this point said (page 475): "The Act of 1929, as amended, does not specifically mention the Commonwealth nor does it indicate any intendment on the part of the legislature to deprive the State of its nonliability for the payment of interest on its obligations. When the legislature has such an intention it will clearly express it in a statute."

A similar principle was asserted in *Commonwealth of Pennsylvania, State Employes' Retirement System v. Dauphin County, et al.,* 335 Pa. 177, 6 A. 2d 870. Section 201 of the Act of May 22, 1933, P.L. 853, contained a general provision subjecting "all real estate" to taxation by municipal bodies. In spite of this broad and general language the Court held that the statute gave no authority to the municipality to tax real estate owned by the Commonwealth or by one of its boards, and said (p. 181): "Legislative enactments presumptively affect only private rights and do not embrace the rights of a sovereign unless the sovereign is explicitly designated or clearly intended."

It is therefore clear, under the facts in this case and the aforesaid applicable authorities, that said Act of

July 2, 1937, gave no right, power or authority to the City of Pittsburgh to acquire a fee simple title in or to sell Diamond Square.

Equally unavailing is the claim of the City of Pittsburgh that it acquired title to this dedicated land by prescription or by adverse possession or by lapse of time, because none of these suffice to give the City a title as against either the public or the Commonwealth. *Rung v. Shoneberger*, 2 Watts 23; *Commonwealth v. McDonald*, 16 S. & R. 390; *Commonwealth v. Alburger*, 1 Wharton 468; *Pittsburg v. Epping-Carpenter Company*, 194 Pa. 318, 45 A. 129.

Moreover the defendant is in no position to claim title by acts of alleged ownership or control, first, because it has a right and duty on behalf not of itself but of the public to regulate and control the public use of Diamond Square as a public square and a right to erect or remove buildings thereon; and secondly, because the more important acts on which it relies to evidence ownership were taken pursuant to authority granted by the legislature of the Commonwealth of Pennsylvania.

For the above mentioned reasons, it is unnecessary to discuss or decide the interesting and important constitutional question of whether the legislature can authorize a municipality to sell *for a private use* property which has been dedicated to the public, although some cases have held that no such authority exists;* even

---

* *Commonwealth v. Rush*, 14 Pa. 186, 191; *Trustees of the Philadelphia Museums v. Trustees of the University of Pennsylvania*, 251 Pa. 115, 96 A. 123; *Ormsby Land Co. v. Pittsburgh*, 276 Pa. 68, 70, 119 A. 730; *Pennsylvania Mutual Life Insurance Co. v. Philadelphia*, 242 Pa. 47, 88 A. 904; *Philadelphia Clay Co. v. York Clay Co.*, 241 Pa. 305, 308, 88 A. 487; cf. *Commonwealth v. Alburger*, 1 Wharton 468, 485; *Belovsky v. Redevelopment Authority*, 357 Pa. 329, 340, 54 A. 2d 277; *Wentz v. Philadelphia*, 301 Pa. 261, 271, 151 A. 883; *Dornan v. Philadelphia Housing Authority*, 331 Pa. 209,

though an incidental benefit accrue to the public, and even though provision be made for compensation to those persons who have a fee simple or reversionary interest.

Decree affirmed; costs to be paid by City of Pittsburgh.

200 A. 834; *Schenk v. Pittsburgh*, 364 Pa. 31, 70 A. 2d 612, *McSorley v. Fitzgerald et al.*, 359 Pa. 264, 59 A. 2d 142; *Armstrong County v. McElheny*, 273 Pa. 208, 116 A. 812.