Costos C. Costopoulos et al. *v.* Zoning Board of Adjustment and the Borough of Carlisle. Costos C. Costopoulos et al., Appellants.

160

Argued December 3, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*William C. Costopoulos,* with him *Kollas & Costopoulos,* for appellants.

*William F. Martson,* with him *J. Wesley Oler, Jr.* and *Martson and Snelbaker,* for appellees.

OPINION BY JUDGE WILKINSON, February 2, 1976:

On March 13, 1969, the Borough of Carlisle, Cumberland County, Pennsylvania, enacted Ordinance 1056 (ordinance), here in controversy. The ordinance prohibited the erection or maintenance of projecting signs[1] over public areas and mandated the removal of like existing signs at the expense of the owner thereof, no later than March 13, 1974. In February of 1974, the instant action was commenced and on March 2, 1974, the Cumberland County Court of Common Pleas issued an order staying enforcement of the ordinance pending a final determination of the case on its merits.

On May 3, 1974, a hearing was held before Judge CLINTON WEIDNER. At that time, appellants introduced evidence showing the appellants, plaintiffs below, were merchants in Carlisle who had previously erected on their commercial establishments[2] projecting signs in accordance with the then existing law, that the signs were of substantial expense when purchased, would be of greater expense to reproduce today,[3] and would cost

---

1. A projecting sign was defined in the sign ordinance as "any sign having the horizontal axis of the plane of its face or faces at right angles, or at any angle greater than zero, to the wall of any building or structure and having any portion thereof extending into or above any street, sidewalk or other public area." Ordinance 1056, Section 1.

2. Because all of the signs in controversy are commercial in nature and because appellants have not raised the issue, we have not discussed the First Amendment freedom of speech aspects of this ordinance. We note, however, that commercial speech is not given the same protection provided non-commercial speech and is subject to regulation. *Pittsburgh Press Company v. The Pittsburgh Commission on Human Relations,* 413 U. S. 376, *rehearing denied* 414 U. S. 881 (1973); *Valentine v. Chrestensen,* 316 U. S. 52 (1942).

3. The court below found the signs were erected between 1930 and 1963 at costs ranging from $500 to $3,000 and had present replacement costs ranging from $500 to $8,000. The value of each of the appellants' signs has been fully depreciated for tax purposes.

hundreds of dollars to remove. The appellees, defendants below, presented testimony which was controverted by the appellants, attempting to prove that the ordinance would eliminate hazards to motorists and pedestrians, facilitate firefighting, escalate real estate values and be of aesthetic benefit to the community. The appellants introduced testimony that the signs in question were then, and in the future could be, maintained in a safe condition.

On September 20, 1974, the Common Pleas Court ruled the contested ordinance valid. The appellants filed exceptions to this adjudication which were dismissed by the court en banc on April 4, 1975, and a final decree, affirming the earlier decision adverse to the appellants, was entered. It is from this decree that appellants now appeal.

Ordinarily, a presumption of constitutionality arises whenever an ordinance is attacked, putting the burden of proving unconstitutionality on the party asserting invalidity. *Borough of Tarentum v. Sadecky*, 16 Pa. Commonwealth Ct. 163, 329 A.2d 328 (1974). Appellants, citing *Beaver Gasoline Company v. Osborne Borough*, 445 Pa. 571, 285 A.2d 501 (1971), and *Amerada Hess Corporation v. Zoning Board of Adjustment*, 11 Pa. Commonwealth Ct. 115, 313 A.2d 787 (1973), urge us to find that in the instant case, there is no such presumption because the ordinance constitutes a total zoning ban on an otherwise innocuous use. We must disagree.

The rule and cases cited by the appellants pertain to zoning ordinances. The ordinance before the Court regulates public rather than private property. Furthermore, the instant regulation is not a total ban on signs; any sign, even a projecting sign, is permitted if entirely on private property and signs parallel to buildings are permitted over public areas.

Appellants dispute the right of the appellees to control the streets and sidewalks of the Borough of Carlisle. Although the burden was upon them, appellants pre-

sented no evidence establishing their ownership or right to use of the space in question. Appellees, on the other hand, entered into the record a 1751 street plan showing the width of the streets of Carlisle to include the contested area. Appellees also relied on *Bruker v. Carlisle Borough,* 376 Pa. 330, 102 A.2d 418 (1954), a case in which the right of the Borough of Carlisle to modify the market square was contested. There, the Honorable Chief Justice HORACE STERN, speaking for the Court, stated:

"[T]here is no doubt that the mere fact of the use of the Square by the public for now more than 200 years, is sufficient to raise a conclusive presumption of an original grant for the purpose of a public square; such as an ancient and well established principle of law: Wallace v. Harmstad, 44 Pa. 429, 496; cf. Hoffman v. City of Pittsburgh, 365 Pa. 386, 389, 75 A.2d 649, 650." 376 Pa. at 336, 102 A.2d at 421.

An ordinance similar to the ordinance hereunder consideration was the subject of *Congress Hotel Company v. Samuel,* 66 Pa. D. & C. 418 (1948). The court there said:

"In the case of signs wholly on private property, the municipality, under the police power delegated to it by the State, may regulate all structures within its corporate limits, provided the regulations bear a substantial relation to the maintenance of the health, safety, morals, and welfare of the community. . . . But where signs or other devices project over public property or encroach upon the air space over it, the law is clear that the municipality may regulate them without regard to the public safety, welfare and morals, and may do so on the theory that no one has a right to appropriate to himself that which belongs to the public. . . ." 66 Pa. D. & C. at 422. (Citations omitted.)

In *Lenon v. Porter,* 65 Pa. Superior Ct. 94 (1916), an ordinance of the City of Philadelphia requiring the removal of awnings and awning poles was attacked. The Court upheld the ordinance, deciding:

"He who asserts a right to maintain any structure extending over any part of a public street must show legislative authority therefor or municipal license authorized by statute. . . . It is clearly within the power of the legislature to at any time prohibit the maintenance by owners of abutting property of any structures connected with their buildings extending over public streets, and this power they may delegate to municipalities, to be exercised within the municipal limits." 65 Pa. Superior Ct. at 98. (Citations omitted.)

*See also Reimer's Appeal,* 100 Pa. 182 (1882), where the lower court decree, enjoining the maintenance of a bay window extending beyond the building line and over a public area, was affirmed.

The Legislature has specifically authorized the boroughs to enact regulatory laws such as Ordinance 1056. Section 1201 of The Borough Code, Act of February 1, 1966, P.L. 581, *as amended,* 53 P.S. §46202, provides, in part:

"The powers of the borough shall be vested in the corporate authorities. Among the specific powers of the borough shall be the following, and in the exercise of any of such powers involving the enactment of any ordinance or the making of any regulation, restriction or prohibition, the borough may provide for the enforcement thereof and may prescribe penalties for the violation thereof or for the failure to conform thereto:

. . . .

"(17) Street and sewer regulations; obstructions. To regulate the streets, sewers, public squares, common grounds, sidewalks, curbs, gutters, culverts and drains, and the heights, grades, widths, slopes and construction thereof; and to prohibit the erection or

construction of any building or other obstruction to the convenient use of the same.

. . . .

" (74) General powers. To make and adopt all such ordinances, bylaws, rules and regulations not inconsistent with or restrained by the Constitution and laws of this Commonwealth, as may be expedient or necessary for the proper management, care and control of the borough and its finances, and the maintenance of peace, good government, safety and welfare of the borough and its trade, commerce and manufactures."

The appellants also assert the need for a legitimate public purpose to be served by the ordinance. The court below, supported by the record, found such a purpose.

"13. The removal of existing projecting signs would favorably affect the public health, safety and welfare by eliminating potential hazards to motorists and pedestrians, by facilitating fire fighting, and by appreciating real estate values."

Other arguments raised by the appellants, attacking the ordinance as an invalid zoning, need not be discussed here due to our affirmation of the lower court's finding that the instant ordinance was a regulation rather than a zoning law.

Affirmed.

---

DISSENTING OPINION BY JUDGE KRAMER:

I respectfully dissent, because I believe the ordinance in question, both on its face and as applied, violates the appellants' rights under the First and Fourteenth Amendments to the United States Constitution. The ordinance both abridges freedom of speech, on its face, and effects a taking of property without due process of law, as applied to the facts.

The terms of the ordinance deserve a close examination. The language is broad and all-encompassing, as evidenced by the following definition of the term "sign":

"The term 'sign' when used in this ordinance means *any letter, word,* model, *poster, sign,* device *or representation used in the nature of an* advertisement, *announcement* or direction *on any* surface or *place.* ..." (Emphasis added.)

The proscriptive portions of the ordinance totally prohibit "projecting signs" and "curb signs," and restrict the dimensions of certain permitted "wall signs." For those types of signs which are permitted by the ordinance, a permit is required for both installation and maintenance.

Interestingly, the trial court did not find that the continued existence of appellants' signs would be harmful to the public health, safety or welfare. Rather, the court found that the removal of existing signs would "favorably affect" the public by "eliminating potential hazards to motorists and pedestrians, by facilitating fire fighting, and *by appreciating real estate values.*" (Emphasis added.) This rather delicate finding of a "favorable" effect on the public welfare is undoubtedly the result of the fact that the record discloses only obscure and unproven public safety considerations. There is no doubt that the ordinance was intended for aesthetic purposes; and the appreciation of land values mentioned by the trial court probably is a statement of the real intention behind the ordinance.

The illusory nature of the public safety considerations suggested by the Borough is borne out by the record. For example, only signs which extend onto "public property" are regulated, although the public safety reasons mentioned by the police and fire chiefs as the purposes for the ordinance would apply equally to signs existing strictly on private property. Additionally, I note that the ordinance exempts from its provisions any signs erected by

government, regardless of safety considerations. Perhaps most telling was the inability of the Borough to produce any evidence that the appellants' signs are unsafe or interfere in the slightest way with the use of public streets or sidewalks.[1]

If the intent of the Borough was to protect the public safety, the proof offered by the Borough (through photographs) shows there are many protrusions from buildings which are as dangerous to the public safety as the prohibited signs. For example, the photographs show air conditioners, electric lamps, theater marquees, TV antennas, fire escapes, porches, balconies, flag poles, governmental signs of all kinds, religious church signs, parking meters and awnings. If the intent was to protect against protrusions, only the appellants have been singled out for proscriptions. Interestingly, although awnings extend over the public sidewalks and streets, they are permitted to remain; but, if the owner placed his street number on the awning, he would be technically in violation of the ordinance.

With these thoughts in mind, I offer my specific objections to the majority opinion.

## I. FIRST AMENDMENT

The majority discounts the "freedom of speech aspects of this ordinance" because (1) the appellants have not raised the issue, and (2) all of the signs in controversy are commercial in nature and do not represent political expression.

With respect to whether the appellants have raised an issue concerning First Amendment rights, the complaint clearly alleges that the ordinance is unconstitutional and an invalid exercise of the police power. Even if the appellants may be faulted for not specifically press-

---

1. Ironically, it is not difficult to imagine the traffic and safety problems which will be caused by *removing* signs which inform searching motorists of the location of a business.

ing a claim of abridgement of freedom of speech before this Court, my perception of the primacy of the First Amendment in our constitutional system prohibits me from joining an opinion which sanctions the enforcement of an ordinance which lends itself to abuse in this sensitive area.

The majority cites *Pittsburgh Press Company v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, *rehearing denied*, 414 U.S. 881 (1973) as authority for the proposition that "commercial speech" is not afforded the same protection as political or quasi-political expression. This distinction is undeniably recognized in law, but I also recognize that the advertising policy struck down in *Pittsburgh Press* was by its own terms limited to a commercial context. It should be pointed out that none of the signs involved in this case are leased by the owner to another party for commercial use. All of the signs are used by their owners for the purpose of advertising the sign owner's business.

If the ordinance in the instant case was limited, by its own terms, to commercial signs, this dissent might not be necessary. My objection to the ordinance, insofar as freedom of speech is concerned, lies in the *breadth* of its terms and its total lack of discrimination between private, commercial and political expression. A reading of the ordinance definition of "sign," quoted above, leaves no doubt whatever that many examples of protected speech can be embraced by its terms.

In *Lovell v. City of Griffin*, 303 U.S. 444 (1938), the Supreme Court invalidated as facially unconstitutional an ordinance which broadly prohibited the distribution of hand bills. In language which is appropriate to the instant case, the Court said:

> "The ordinance in its broad sweep prohibits the distribution of 'circulars, handbooks, advertising, or literature of any kind.' It manifestly applies to pamphlets, magazines, and periodicals. The evidence against

appellant was that she distributed a certain pamphlet and a magazine called the 'Golden Age.' *Whether in actual administration the ordinance is applied, as apparently it could be, to newspapers does not appear.* The city manager testified that 'every one applies to me for a license to distribute literature in this City. None of these people (including defendant) secured a permit from me to distribute literature in the City of Griffin.' *The ordinance is not limited to 'literature' that is obscene or offensive to public morals or that advocates unlawful conduct.* There is no suggestion that the pamphlet and magazine distributed in the instant case were of that character. The ordinance embraces 'literature' in the widest sense.

"*The ordinance is comprehensive* with respect to the method of distribution. It covers every sort of circulation 'either by hand or otherwise.' *There is thus no restriction in its application with respect to time or place. It is not limited to ways which might be regarded as inconsistent with the maintenance of public order, or as involving disorderly conduct, the molestation of the inhabitants, or the misuse or littering of the streets.* The ordinance prohibits the distribution of literature of any kind at any time, at any place, and in any manner without a permit from the city manager.

"*We think that the ordinance is invalid on its face. Whatever the motive which induced its adoption, its character* is such that it *strikes at the very foundation of the freedom of the press by subjecting it to license and censorship.*" 303 U.S. at 450-451. (Emphasis added.)

*See also Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza,* 391 U.S. 308 (1968); *Schneider v. State of New Jersey,* 308 U.S. 147 (1939); and *Hague v. Committee For Industrial Organization,* 307 U.S. 496 (1939).

*Amalgamated Food Employees, supra,* also has peculiar applicability to the instant case. There the Supreme Court held that First Amendment protections extend to activity which is conducted in locations which are generally held open to the public, even though title to the land in question may be privately held. In light of the Borough's contention in the instant case that it is merely regulating activity above publicly-owned land (and asserting its rights as a property owner), the following passage from *Amalgamated Food Employees* is pertinent:

"The essence of those opinions [the cases cited *supra*] is that streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely." 391 U.S. at 315.

It should also be noted that the activity which the Court protected in *Amalgamated Food Employees* was informational union picketing directed at discouraging patronage of a business establishment—an activity which is, in fact, the converse of a sign which encourages patronage of a business establishment.

I do not take the position that the Borough of Carlisle is restrained by anything in the Constitutions of the United States or Pennsylvania from protecting the community's interest in relation to its streets. But a citizen's right to free speech, on balance, should be given a preferred status in the law over an ordinance which restricts that freedom for reasons not necessary to protect the public health, welfare and safety. I have no reservations that the Borough of Carlisle can regulate the erection, construction and maintenance of signs under its police power. From my point of view the question is not whether they have the power to regulate, but rather whether the ordinance represents arbitrary action by the Borough, a vice

to be guarded against when a citizen's constitutional rights are being restricted.

I would hold the ordinance invalid on its face.

## II. FOURTEENTH AMENDMENT

As the majority opinion notes, the appellants' signs were originally erected at costs ranging from $500 to $3,000, with present replacement cost ranging from $500 to $8,000. If the ordinance is enforced, the appellants will not only have their investment in the construction and maintenance of the signs rendered valueless, but they will incur the additional expenses of paying for the removal of the signs,[2] and, presumably, of paying for some substitute form of advertising. There is no question that the appellants have a property interest protected by the Fourteenth Amendment from a governmental taking without due process of law.

As I have noted in the introductory portion of this opinion, the relationship between the ordinance and valid police power objectives is tenuous at best. This problem aside, however, the Borough argues, in effect, that the ordinance renders an offending sign a trespass upon publicly-owned property, specifically offending the Borough's air rights in the space above its sidewalks.

The record is devoid of evidence concerning precisely who owns the sidewalks over which the signs extend, except for the Borough's reference to *Bruker v. Carlisle Borough*, 376 Pa. 330, 102 A.2d 418 (1954). *Bruker* only held that use of the square in the Borough of Carlisle by the public for over 200 years raised a conclusive presumption that the colonial proprietors of Pennsylvania intended a grant of the square for public purposes. How mere judicial notice of the narrow holding of *Bruker* can establish title to the sidewalks of the Borough is a

---

2. The ordinance specifically provides that the owner shall bear the cost of removing any sign prohibited by the ordinance.

mystery. Absent such a conclusion, this record contains absolutely no basis for positing ownership of the air rights above Carlisle's sidewalks in the Borough. One might just as validly assume that the property line extends to the middle of the street with the Borough holding an easement for public thorofares.[3] Such is not an uncommon arrangement.

Bearing in mind that I have *assumed* in this section of this opinion a valid police power purpose, and am now *assuming, arguendo,* that the Borough does own the sidewalks, I am still struck by the fact that, at least in the case of some of the signs, the Borough, through a written permit, allowed the appellants to erect and maintain the signs. The Borough would have us treat its grant of permission as a revocable license. This concept is an established principle in the law of real property, and I recognize that a landowner may, in the usual case, revoke a license at will. The instant case, however, is not the usual case.

Pennsylvania has long recognized that even an oral license, without consideration, may become irrevocable if the licensee makes an expenditure in justifiable reliance upon the license. When an irrevocable parol license is thus established, the licensor is estopped from interfering with its enjoyment. *Leininger v. Goodman,* 277 Pa. 75, 120 A. 763 (1923) ; *Thompson v. McElarney,* 82 Pa. 174 (1876) ; *Messinger v. Washington Township,* 185 Pa. Superior Ct. 554, 137 A.2d 890 (1958); *Hanna v. Hanna,* 57 D. & C. 2d 80 (1972); and *Cherry v. Harrison,* 55 D. & C. 2d 230 (1971). In the instant case the Borough, by the necessary implication of its own argument, has granted a license in reliance on which the appellants have expended considerable sums of money.

---

3. The fact that the appellants' deeds might not indicate such an arrangement does not make the asumption less plausible, since in both *Bruker, supra,* and the instant case, the Borough had no documentary support for its version of the ownership.

Further, in the instant case we have a governmental landowner acting as licensor. There is a unique relationship in both the law and in these peculiar circumstances between a merchant with frontage along a sidewalk, and the public for whose benefit the local government holds whatever title it may have. As the appellants point out in their brief, abutting property owners in Carlisle may be required by ordinance to pay for the construction and maintenance of sidewalks along their property.[4] The abutting property owner is likewise responsible for snow removal, and may suffer tort liability for negligence in maintaining an abutting sidewalk. In short, the Borough would have us hold that its license is revocable at will, despite reliance by the appellants, and despite the fact that the appellants have for years had many of the burdens of ownership. No doubt if the Borough decided that its sidewalks were in need of repair on the day after the forced removal of the appellants' signs, it would not hesitate to require that the appellants pay for the repaving.

The irrevocable license doctrine I have referred to above is based upon equitable considerations, as the cases make clear. These considerations appear to be even more acutely present when the unique burdens of owning land abutting a sidewalk are considered.

I would hold that, even *assuming* a valid police power consideration is present, the forced removal of the appellants' signs without compensation is a taking of property without due process of law.

I dissent.

Judge MENCER joins in this dissent.

---

4. Section 1801 of the Borough Code, Act of February 1, 1966, *as amended*, 53 P.S. §46801, empowers boroughs to require abutting landowners to "grade, construct, drain, pave and repave" a sidewalk.